520 F.2d 945
 90 L.R.R.M. (BNA) 2147, 77 Lab.Cas. P 11,069
 FOAM AND PLASTICS DIVISION, TENNECO CHEMICALS, INC.
v.
GENERAL DRIVERS AND HELPERS LOCAL UNION 401, INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, Appellant.
 No. 75-1004.
 United States Court of Appeals,
Third Circuit.
 Argued June 23, 1975.
Decided Aug. 18, 1975.
 
 Sheldon Rosenberg, Jacob Nogi, Nogi, O'Malley & Harris, Scranton, Pa., for appellee.
 Richard M. Goldberg, Allan M. Kluger, Hourigan, Kluger & Spohrer Associates, Wilkes-Barre, Pa., for appellant.
 Before BIGGS, ROSENN and WEIS, Circuit Judges.OPINION OF THE COURT
 BIGGS, Circuit Judge.
 
 
 1
 The appellee, Foam and Plastics Division, Tenneco Chemicals, Inc. (Tenneco), brought suit, basing jurisdiction upon Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, against the appellant, General Drivers and Helpers Local Union 401, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Local 401), seeking to enjoin both preliminarily and permanently Local 401, its officers and members, from engaging in an alleged illegal work stoppage at Tenneco's Hazelton, Pennsylvania plant. Tenneco also requested that Local 401 be directed to utilize the grievance and arbitration procedure in the collective bargaining agreement between the parties for the resolution of any grievance dispute, and that compensatory damages be awarded Tenneco. The court below found there had been a breach of the collective bargaining agreement and an illegal strike and granted Tenneco damages. The court refused, however, to grant a temporary or permanent injunction against the Union because the work stoppage lasted for only one shift and had not recurred. Local 401 has appealed from the court's decision, but Tenneco has not appealed from the failure to grant injunctive relief.
 
 I.
 
 2
 Local 401 insists that Tenneco failed to meet its burden of proof that officers or agents of Local 401 rendered the Union liable for damages by instigating an illegal work stoppage in violation of the parties' collective bargaining agreement. Local 401 fails to sustain this position. Of 78 drivers employed by Tenneco, 43 or 44 were scheduled to work on the evening of July 23, 1974. On the evening of July 23, some 49[1] of these drivers called in stating they were ill. Only one truck trip with two men went out as scheduled about 9:00 P.M. Wein, manager of labor relations of Tenneco, attempted to call Panzarella, a signatory to the collective bargaining agreement and a driver, and also the chief shop steward at Tenneco's plant, very early on the morning of July 24, i. e., shortly after midnight, but was unable to reach him. Wein talked to Panzarella's mother, who informed him that Panzarella "had not been in all night" although Panzarella had called in sick at 9:20 P.M. on July 23. Wein placed other calls to Panzarella during the night without result. Finally, at around 5:45 A.M. on July 24, Panzarella returned Wein's calls, and a conference was scheduled for later that morning. About 8:00 A.M. a meeting was held between Panzarella and two other shop stewards with Wein, and Wein directed Panzarella to tell the employees to go back to work. Panzarella replied that as a non-physician he was in no position to order sick men back to work. He further testified that under Tenneco's regulations when a man calls in as sick and does not come in to work, he cannot be scheduled to work until the following day. These facts were confirmed by Spatz, Tenneco's distribution manager. It appears from the evidence that the July 24 meeting continued until about 3:00 P.M. All of the truckers due to operate on the evening shift for July 24 reported for duty.
 
 
 3
 The following facts should be noted in reference to the evening and morning hours of July 23-24: Panzarella stated he "called off" work at approximately 8:45 P.M. on the evening of July 23[2] and that he was subsequently informed by Tenneco's dispatcher that the dispatcher had someone to take his place. Panzarella was called by "his steward" at midnight on July 23 and was informed that "everyone is calling off". He then called the night dispatcher and was told that "14 men had called off" at that time, i. e., about midnight. He testified also that there were occasions when the company had as many as 27 men "off" in an evening and, therefore, Panzarella said he was not alarmed. He further stated that, when he asked the dispatcher whether anything was wrong, he was told, "(N)o, they (the men) are just calling off."
 
 
 4
 During the day of July 24, a telegram was sent by Wein to the officials of Local 401 at its office in Wilkes-Barre. No information respecting the shift was received from Local 401 as a direct result of that telegram. Pudlowski, secretary-treasurer of Local 401, stated that the Local's officials were in Reading attending a meeting from 10:30 A.M. to 5:30 P.M. on July 24. Panzarella also testified that on July 24 he attempted to contact Namey, vice-president and business agent for Local 401, who services the Tenneco plant. He stated that when he called the Union office between 8:00 and 8:30 A.M., July 24, he was advised that Namey was attending a meeting in Reading and that Namey's office would attempt to contact Namey.
 
 
 5
 At the meeting Panzarella was informed that it was Tenneco's position that the "sick out" of approximately 90% of Local 401's drivers constituted a violation of the no strike clause. Under the terms of the bargaining agreement the Union was required immediately to order its members to return to work.[3] After the completion of the morning portion of the meeting with Tenneco, Panzarella was able to inform the business agent of Local 401 with certainty that all matters were taken care of and that a full contingent of drivers would be returning to work. He was able to say this even though, according to his testimony, he talked to only four yardmen and did not contact any drivers.[4] Local 401 maintains that the work stoppage was purely coincidental and a case of what could be called spontaneous combustion upon the "sick" drivers. This beggars credulity. According to the well established principle of agency, a union is responsible for the actions of its officers and members. In particular, see NLRB v. Bulletin Co., 443 F.2d 863, 867 (3d Cir. 1971); Adley Express Co. v. Highway Truck Drivers & Helpers Local 107, 349 F.Supp. 436, 443-444 (E.D.Pa.1972). See also, United Mine Workers v. Gibbs, 383 U.S. 715, 736, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Mason-Rust v. Laborers' Int'l. Union, Local 42, 435 F.2d 939, 943 (8th Cir. 1970); United Steel Workers v. CCI Corp., 395 F.2d 529, 532 (10th Cir. 1968). See ILGWU v. NLRB, 99 U.S.App.D.C. 64, 237 F.2d 545, 551 (1956). As was said in United States v. International Union, U.M.W., 77 F.Supp. 563, 566 (D.D.C.1948), aff'd, 85 U.S.App.D.C. 149, 177 F.2d 29, cert. den.,338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949), "(M) en don't act collectively without leadership." Section 301 of the National Labor Relations Act, 29 U.S.C. 185(e), states: "For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."
 
 
 6
 The testimony in this case establishes that on July 23, 1974, over 90% of appellant's scheduled drivers called in sick. As the District Court stated in its memorandum decision: "To ask this Court to find that the absence of approximately 90% of its members on the evening of July 23 was a quirk of circumstances is absurd."[5] We agree. Moreover, Local 401 breached the collective bargaining agreement by failing to take effective steps to recall its members to work. See and compare Eazor Express, Inc. and Daniels Motor Freight, Inc. v. International Brotherhood of Teamsters et al., --- F.2d --- (3d Cir. 1975) (opinion by Circuit Judge Maris).
 
 II.
 
 7
 The appellant, Local 401, insists that the learned District Judge did not apply the proper measure of damages when he determined that appellant was liable in the amount of $5,045.00. See Appendix "A" to this opinion.[6] It is, of course, as the Union insists, hornbook law that the amount and items of pecuniary damages must be established by the injured party who has the burden of proving the extent and amount of the damages. 11 P.L.E., Damages, § 151. Under the circumstances at bar, the measure of damages arising from a breach of a "no strike" provision of a collective bargaining agreement is the actual loss sustained by reason of the breach. Wilson & Co. v. United Packinghouse Workers, 181 F.Supp. 809, 820-821 (D.C.Iowa 1960). See also Annotation, 92 A.L.R.2d 1232. Apparently, this stricture was applied to fixed expenses as items of damage as well as to additional items of extra expense caused by an unauthorized or wildcat strike in breach of a "no strike" agreement. Certain fixed expenses include, as properly asserted by the appellant, citing Shirley-Herman Co. v. International Hod Carriers, 182 F.2d 806 (2d Cir. 1950), "property insurance, property taxes, compensation and group insurance, social security taxes, and employee pension liability".[7] This, at least partially, was the theory followed by the United States District Court for the District of New Jersey in Structural Steel and O. I. Association v. Shopmen's Local Union, 172 F.Supp. 354, 360-362 (D.N.J.1959).
 
 
 8
 The assertion by the Union is that Tenneco did not meet its burden as to "fixed costs" by showing that it in fact lost the entire value of production which normally would have been generated as a result of these expenses. Rather, Local 401 contends that the additional costs direct expenses were incurred to generate production which, but for the work stoppage, would have issued from the regular personnel. As to the item of $408 for salaried traffic personnel, it is pointed out by the Union that these persons were paid regardless of whether they were sick or what hours they worked. Then comes an obscure statement in the Union's brief, allegedly based upon the testimony of Kubert, the plant accountant, that "While the Plant Accountant testified that there was no work for . . . (these salaried traffic personnel), vehicles still had to be dispatched and there was no testimony that they did not perform a valid function for the Company on that date. They could easily have performed in a productive manner in a related area, even though there were physically no vehicles to dispatch from the plant." Appellant's Brief, p. 14. This observation adds nothing to the appellant's case.
 
 
 9
 The Union asserts that Tenneco did not meet its burden of proof to show loss as to employee benefits "because items such as insurance and other fringe benefits cover the employee 365 days a year and, consequently, there . . . (was) no loss of production to the Company as a result of the one-shift work stoppage." The amount involved in this one item according to Exhibit P-4 is a comparatively small sum, apparently $90. The Union also objects to the calculation as to depreciation, asserting there is a conflict between Kubert's method of computation and that employed by Internal Revenue Service in making its determinations. The IRS undoubtedly utilizes the "useful life of the assets, which (ordinarily) is by years." This item is also of very small magnitude, i. e., $69.
 
 
 10
 The appellant correctly states in its brief: "There is not one iota of testimony in the record which indicates that the Company lost a scintilla of production as a result of the one-shift work stoppage. The same rationale applies to the amount submitted as to fixed lease costs for vehicles. There was no clear testimony that these vehicles would have been utilized on the day in question and, even if they were, based on the above rationale, there was absolutely no loss of production to the Company." (pp. 14-15).
 
 
 11
 Tenneco insists that the trial court applied the proper method of calculating damages. Section 301 of the LRMA, 29 U.S.C. § 185(e), provides for the award of compensatory damages when a union violates a no strike clause, and it is clear that the courts require only a reasonable estimate of the damages rather than mathematical calculations. See Annotation, 92 A.L.R.2d 1232. The courts have included as elements of damages, as appears from the brief of Tenneco:[8] "Wages paid to the idle employees, including overtime to make up for lost hours, Alcoa S.S. Co. v. Conerford, 17 L.C. Para. 65,480 (S.D.N.Y.1949), actual costs of operation or of standing by, W. L. Mead, Inc. v. International Brotherhood of Teamsters, 129 F.Supp. 313 (D.Mass.1955), overhead expenses, Structural Steel v. Shop Men's Local, 172 F.Supp. 334 (D.N.J.1959),[9] compensatory damages in general, Local 127 v. Brooks Mfg. Co., 298 F.2d 277 (3rd Cir. 1962)."[10] (bracketed note 9 added).
 
 
 12
 It is of course the law and well established, Roadway Express, Inc. v. Highway Truck Drivers & Helpers Local 107, 299 F.Supp. 1058 (E.D.Pa.1969), that the trial court is the trier of the facts and that it is within its province to determine which items are reasonable and which are not. This matter is well-stated in Pennsylvania Legal Encyclopedia, Vol. 11, Damages, Section 12, which asserts as a general principle that damages should be calculated with reasonable certainty, but nonetheless, "Courts will not be astute to permit persons who admit they have committed a wrong to escape the consequences of their acts because of a lack of precise means of proving the commission of the wrong, especially where the nature of the case does not permit exact proof, and where there is a basis in the evidence for a reasonable computation of the damage suffered, considering the nature of the transaction, a verdict may be based thereon, even though there may be some uncertainty as to the amount of damage."
 
 
 13
 "As otherwise stated, compensation cannot be refused because proof of the exact amount of the loss or injury is not produced, for there is judicial recognition of the difficulty or even the impossibility of the production of such proof, and all that the law requires in such cases is that the evidence shall, with a fair degree of probability, establish a basis for the assessment of damages."[11]
 
 
 14
 But there are other considerations here. At first examination the solution to the damages issue adopted by the distinguished District Judge seems to be the correct one, but this conclusion fades with further consideration. The record as to damages is extremely sparse. The fixed costs seem correct in amount, as are the direct expenses caused by the strike and allowed by the district court, but the reasoning of the district court fails when one considers the fact that some consideration of value must have devolved upon the company from the direct expenses incurred to make deliveries during the strike. There are various formulas the district court might have followed. One such permissible formula, which might require a large amplification of the record, would be to estimate the difference between the compensation or considerations received from the use of the extra employees and any other additional trucking facilities, if there be such,[12] the sum of which would constitute one factor the amount of which should be deducted from the compensation or considerations which would have been received by Tenneco had there been no strike. Simply stated, the profit (or loss) achieved on the day of the work stoppage could be deducted from the normal day's profit (or loss). Another and simpler method which we would deem permissible would be to charge the Union the direct expenses (less the backhaul revenue loss which, as noted, was not supported by credible evidence) plus that percentage of the fixed expenses upon which no revenue was generated, despite the direct expenses, due to the work stoppage. This would require a determination of the production resulting from the direct expenses. The percentage of production lost on July 23, 1974 would be multiplied by the fixed expenses and that sum would then be added to the proper amount of direct expenses in order to calculate damages.[13] However, since Tenneco failed to meet its burden of proving that any production was lost in view of the substitution of other carriers and the brevity of the work stoppage, the award for fixed expenses will be disallowed.
 
 
 15
 Accordingly, the judgment of the district court insofar as it found Local 401 guilty of an illegal strike is affirmed, but the district court will be directed to amend its damage award in accordance with this opinion.
 
 
 16
 "APPENDIX"
 ------
Tenneco Chemicals Foam and Plastics Division
A Tenneco Company
Valmont Indusrial Park
Hazelton, Pa. 18201
717-455-4931
 Losses Incurred as a Result of Work
 Stoppage--Not Recoverable
 Fixed Costs $1,888
 Additional costs--Direct expenses 3,934
 --------
 $5,822
 Fixed Costs
Salaried Traffic Personnel $ 408
Employee Benefits 90
Tractor/Trailer Lease Costs 1,321
Depreciation on Company-owned trailers 69
 ---------
 Total Fixed Costs $1,888
 Additional Costs--Direct Expenses
Outside Carrier Costs Incurred $2,470
Substitute Drivers' Wages & Benefits 475
Travel Expense--Traffic Manager 91
Travel Expense--Personnel Director 100
Backhaul Revenue Loss 777(*)
Overtime Supervisor--Baltimore plant 13
Travel Expense--Baltimore Drivers 8
 ---------
 Total Additional Costs $3,934
-----------------------------------------------------------
(*) (This item was disallowed by the trial court.)
 
 
 
 [1]
 The apparent disparity in number of drivers and those who took part in the strike is unimportant in the instant case
 
 
 [2]
 During his testimony, Wein had stated that, based on an examination of the dispatcher's schedule, this call occurred around 9:20 P.M. The time difference is of no relevance, however
 
 
 [3]
 Article XII of the bargaining agreement between Tenneco and Local 401 provides: "Strikes, Stoppages and Lockouts Since the Agreement provides for an orderly method for the adjustment of disputes, strikes, stoppages and lockouts are prohibited. If, however, a strike or stoppage should occur, the Union shall immediately order the workers to return to work. Only the question of fact as to whether an employee participated in or was responsible for such strike, boycott, slowdown, or work stoppage shall be subject to review through the grievance procedure of the contract. Workers who refuse to comply may be replaced or need not be hired by the Employer after the dispute is settled."
 
 
 [4]
 Panzarella's testimony on cross-examination was as follows, and we deem it illuminating as to his state of mind:
 "Q. You spoke with a couple of yard men and based upon a conversation with a number of yard men, you were able to tell Mr. Namey that 40-some odd drivers would return to work that night?
 A. I said everything was going good and they would return to work.
 Q. Well, what led you to that conclusion?
 A. By talking to them.
 Q. You only talked to two yard men?
 A. No. I talked to four yard men.
 Q. Okay. You talked with four yard men and based upon talking with four yard men, you were led to the conclusion that 40-some odd of the drivers could return to work that night, the drivers that reported off sick the night before?
 A. I figured the word would get around. We don't call every man.
 Q. My question is: What led you to report to Mr. Namey that all of the men would report for work. Did you know they were better from their illness?
 A. I took it on my own. I figured they would.
 Q. In other words, you came to the conclusion that they weren't completely ill?
 A. I don't know that.
 Q. But you knew even if they were, they would be at work that night?
 A. I figured so."
 Notes of Testimony (August 26, 1974). Appendix, pp. 114a-115a.
 
 
 [5]
 The "Memorandum and Order" of the court, page 122a of the Appendix, contains the word "fork". This typo is translated by us as "for work". The quote is from the original opinion of the District Judge, at 2. Appendix, p. 122a
 
 
 [6]
 The district court allowed all items of damages listed in Appendix "A" save that of backhaul revenue loss ($777.00). This ruling is not contested here, and we believe the district court properly disallowed this sum. The learned District Judge defined backhaul revenue as that "generated when plaintiff's trucks returning to plaintiff's plant pick up materials for other factories owned by the parent company of plaintiff." There was insufficient evidence to support the claim for backhaul revenue loss because Tenneco did not establish that these pick-ups were irretrievably lost
 
 
 [7]
 On page 13, first full paragraph, of the appellant's brief, counsel cites "Shirley-Herman Co. v. International Hod Carriers, 182 F.2d 806 (1950, C.A. 2 N.Y.)," stating: "(T)he Court permitted recovery of certain fixed expenses, including 'property insurance, property taxes, compensation and group insurance, social security taxes, and employee pension liability'." The foregoing clearly indicates that the quotation is from Shirley-Herman Co., but this is not so. The quotation is lifted, apparently, from 92 A.L.R.2d 1232 at 1237, without verification by counsel that it is actually from United Electrical Equipment Radio & Machine Workers v. Oliver Corp., 205 F.2d 376 at 387 (8th Cir. 1953)
 Counsel must obey our rules and file accurate briefs. Such errors, although miniscule, require the time and effort of the Court to track down and place in perspective. The offending quotation will be ordered stricken from the appellant's brief.
 
 
 [8]
 Appellee's Brief, p. 16
 
 
 [9]
 The correct cite is 172 F.Supp. 354
 
 
 [10]
 As mentioned, the asserted claims by Tenneco are shown insofar as they were detailed by the company in Appendix "A" to this opinion
 
 
 [11]
 Id. at 102-103
 
 
 [12]
 In respect to which the record is far from clear
 
 
 [13]
 We are not faced here with the complicated damage circumstances that were before this court in Eazor, supra. For example, Judge Maris stated in his thorough and well thought-out opinion:
 "We think that the measure of damages recoverable in this case is the actual loss sustained by each plaintiff as a direct result of the breach and which may reasonably be supposed to have been in the contemplation of the parties as the probable result of such breach at the time the agreement was made." Id. at ---.
 Nothing of this sort is before the court in the instant case. It should be noted that the contract in Eazor specifically disclaimed liability for unauthorized strikes, that the learned district judge found the strike unauthorized, and that this court accepted that finding.