AIRCO SPEER CARBON–GRAPHITE, a division of Airco, Inc.

v.

LOCAL 502, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA, AFL–CIO.

Civ. A. No. 77–114 B Erie.

United States District Court, W. D. Pennsylvania.

Sept. 24, 1979.

**249**

Alvin B. Coppolo, St. Marys, Pa., Patrick J. Berrigan, Niagara Falls, N. Y., for plaintiff.

Ronald L. Gilardi, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

KNOX, District Judge.

The plaintiff, Airco Speer Carbon-Graphite, a division of Airco, Inc., brought suit, basing jurisdiction upon Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, against the defendant, Local 502, International Union of Electrical, Radio & Machine Workers of America, AFL–CIO, seeking to recover compensatory damages allegedly resulting from an illegal work stoppage or wildcat strike in violation of the collective bargaining agreement then in effect between the parties. The case was tried to the court nonjury on February 20–22, 1979, and, in accordance with Fed.R. Civ.P. 52(a), the court makes the following findings of fact.

## FINDINGS OF FACT

1. Plaintiff Airco Speer Carbon-Graphite, a division of Airco, Inc. (hereinafter "Airco"), is a corporation incorporated under the laws of the State of Delaware. Airco maintains a place of business in St. Marys, Pennsylvania, where it produces carbon and graphite products for use in the steel industry.

2. Defendant Local 502, International Union of Electrical, Radio & Machine Workers of America, AFL–CIO (hereinafter "the Union"), is a labor organization which represents, for the purposes of collective bargaining the union members employed by Airco at its St. Marys facility.

3. Plaintiff and the Union were parties to a collective bargaining agreement, effective June 9, 1975 until June 11, 1978, covering the Airco employees at the St. Marys facility, which agreement was in effect at all times material herein.

4. Articles XVIII and XIX of the agreement contain a detailed grievance procedure including, as its last step, a provision for binding arbitration. Article XXII contains a no-strike clause which provides, as follows:

1. The Union will not cause or officially sanction its members to cause or take part in any strikes (including sit-downs, stay-ins, slowdowns or any other stoppages of work) and will cooperate with the Company in every way possible to prevent any such stoppages of work and to terminate such stoppages that may occur as soon as possible. The Company agrees not to lock out any of the employees.

5. In May, 1977, the officers of the Union included Alfred A. Didonato, President; Jerome Vollmer, Vice President; Harry Yetzer, Treasurer; John V. Petrilli held the position of Field Representative of the International. William R. Smith, Chief Steward, was the highest ranking union official in plaintiff's St. Marys facility and William Allshouse held the position of Assistant Chief Steward. James Metrovich, Lynn A. Crosby and Joseph P. Cardoni were members of the Shop Committee who assisted the Chief Steward at the St. Marys plant.

6. In May, 1977, approximately 550 of the 4,200 members of the Union were employed by plaintiff at its St. Marys facility. The other union members were employed by nine different companies and the terms and conditions of their employment were governed by separate collective bargaining agreements.

7. The production of graphitized electrodes at the St. Marys facility includes a graphitizing process which is accomplished in an Acheson furnace in the following way: a furnace is loaded with thirty-four 29 inch electrodes and, it is then connected to an electrical energy source and submitted to a two phase firing process which generates internal temperatures in the range of 2800 degrees Centigrade. The furnace is then disconnected from its energy source and the cooling process commences. After the furnace has been cooling for approximately ten days the pack material is shoveled away from the electrodes. Upon the completion of this procedure, known as "undermining," slings are placed around the electrodes and they are lifted from their beds by an overhead crane. ( *13–20, *43–48, *63–64, *78).

8. On May 4, 1977, Furnace # 1407 was disconnected from its energy source and on May 17, 1977, the furnace, having cooled for thirteen days, was prepared for undermining. James Majors and Al Dempsey, two of the workmen assigned to the graphitizing department for the second shift of the workday, were ordered to undermine Furnace # 1407 and began work shortly after 2:30 p. m. At 2:38 p. m. Majors reported to Roger M. Yeager, the foreman of the graphitizing department, that he was disabled due to a nagging chest injury and he was then relieved of his duties and taken to the hospital. ( *74, *84–86).

9. At approximately 3:00 p. m. Dempsey complained to Yeager that the furnace was "too hot" to undermine and he was reassigned, pending an investigation. Yeager and the other foreman of the graphitizing department, Richard Caruso, examined the furnace and found that it had cooled sufficiently for undermining. They picked up the pack material and touched the electrodes with their bare hands and determined that Furnace # 1407 was cooler than many other furnaces at the undermining stage of the graphitizing process. ( *78, *87–92).

10. In accordance with work seniority rules, Ed Auman and Ray Rowles, two of the other crew members, were assigned to undermine # 1407 and, approximately twenty minutes later, they also complained to Yeager that the furnace was too hot and refused to continue undermining it. The furnace was then examined by Frank A. Asti, the General Foreman, and Bertil B. Anderson, the Safety Engineer. They determined, from their direct observation, that the furnace was safe for undermining. James Gausman, the Superintendent of the Graphitizing Department, then met with the workmen and Union Steward for the crew, Bernard Heiberger, and reported that the inspections revealed that the furnace had sufficiently cooled and that the crew members would face disciplinary action if the assigned work were not performed. ( *49, *93, *96, *97, 7–9, 21–22, *95).

11. Pursuant to their instructions, Dempsey and Rowles returned to undermine # 1407, and, at approximately 5:10 p. m., they again complained that the furnace was too hot and refused to undermine it. Caruso and Yeager instructed them to punch out and report to the Personnel office the following morning. Before the suspended workmen punched out at 5:19 p. m., they conferred with their steward, Bernard Heiberger. Heiberger told Yeager and Caruso that, if the men were suspended, "I'm going to take this whole place and shut it down. Go out and take everybody with me." ( *100–*104, 10–11).

---

* The trial transcript was recorded by two reporters. The first day of trial is reported in a volume with pages numbered serially from 1 to 201. Reference to this volume is made by the asterisk "*" followed by the page number. Reference to pages of the transcript for the final two days of trial is made by page number without the asterisk.

12. Heiberger then led a walkout of the following crew members: Ed Auman, Jim Price, Dale Reed, Robert Grunthener, and Robert Klaiber. The workmen punched out, showered and left the plant. Caruso then reported the walkout to Gausman and Harry Whiteman, the Assistant Plant Manager and William Daugherty, the Personnel Manager, and Mr. Maletto, the Safety Engineer, were also advised of the incident. Whiteman, Daugherty, and Maletto inspected # 1407 and concluded, from their observations, that it had cooled sufficiently for undermining. ( *106–111, *174, 12–14, 56). They had arrived at the plant at approximately 6:00 p. m. ( *173).

13. Chief Steward Smith and Assistant Chief Steward Allshouse learned of the undermining complaints at approximately 3:00 p. m. on the day of the walkout when Daugherty related the problem to them during the course of a grievance meeting. At approximately 4:00 p. m. Anderson informed Smith of the Gausman directive. Smith and Anderson then inspected the furnace together. Smith neither confirmed nor denied that the furnace was fit for undermining. Smith overheard discussion in the lunchroom at approximately 4:30 p. m. including a statement from Heiberger that the crew had to do something about the working conditions and that they weren't going to work under the present conditions. When Klaiber informed him that the graphitizing crew had walked out, Smith went to the graphitizing department office and remained there for approximately an hour until Daugherty arrived. ( *170–177, 29, 244–247, 262–263).

14. Daugherty dispatched Smith and Allshouse to locate the graphitizing crew, advise them of their contract violation, and instruct the union officials to report to him before 8:00 p. m. Shortly after Smith and Allshouse left the plant and at approximately 6:48 p. m. the picketing commenced. ( *173, *177, 87–89, 249–250, 264).

15. Smith and Allshouse drove to Heiberger's home and failing to locate him, they returned to St. Marys, stopping for ten or fifteen minutes at a softball field because Smith's wife and daughter were there. They next telephoned Didonato and failing to reach him, they telephoned Vollmer, received a busy signal, and then drove the eleven miles to Kersey to reach him at home. Smith and Allshouse then returned to the plant, arriving shortly after 8:00 p. m. (251, 265, 266, 251, 252, 267–268).

16. When Smith and Allshouse failed to return to the Airco plant by 8:00 p. m., Daugherty called Didonato at his Ridgway residence advising him of the walkout and requesting action. Didonato immediately proceeded to the union hall in St. Marys and, upon his arrival at 9:00 p. m., called the Airco plant. The union officials who were assembled at the union hall agreed that the strike and picketing were illegal activities. Shortly before the third shift was scheduled to report at 10:30 p. m., an in-plant meeting was held between union and management officials. Airco demanded the removal of the pickets before 10:30 p. m. as a condition to negotiations. The pickets failed to disperse, however, and workers on the second shift, in large numbers, joined the picket line at the end of their shift. The third shift personnel either joined the pickets or did not attempt to cross the line. Production throughout the entire plant was then shut down. A further meeting between management and union officials was held after the third shift failed to report. Allshouse successfully dispersed the pickets at the Theresia gate entrance to the plant before the negotiations began. At this meeting the union demanded amnesty for all union personnel involved in the walkout, which demand the company rejected. Union officials then vacated the plant and mass picketing resumed. The union took no further action that evening. ( *178–181, 300–301, 302, 253, 277, 303, 254, *186–187, 304, *139, *141, 187–188, *141–142, *188–189, 305, *143, *190, 305–306, *190–191, 257, 306–307).

17. In the early morning of May 18, 1977, mass picketing resumed at all of the gates to the Airco plant. Picketing continued on the following days with the pickets walking the line on a four hour rotation

basis. The pickets turned away delivery trucks and denied access to management personnel despite the issuance of a temporary restraining order by the Court of Common Pleas of Elk County on May 18, 1977 and the arrests of eighteen pickets. The Union Executive Board provided the bail, the bail bonds being signed by either Didonato or Yetzer. The only break in the picketing occurred on May 24, 1977, when the pickets were temporarily removed from the Administration Building after a discussion between Satanek and the General Counsel of the International Union. The strike ended on May 25, 1977, within one hour of the granting of a permanent injunction by Judge Greiner of the Court of Common Pleas of Elk County. (*145–147, *192–194, 42–43, 258, *200, 46, 74, 100, 101–102, *157–158, 118–119, 122–123, 170–172, 123–124, 133–134, 149, *156–157, 314).

18. The union failed to take any action to end the strike from the time of the second meeting of May 17, 1977, until the strike ended on May 25, 1977, except for orally directing the union members to cease picketing and to return to work. Anderson and Wayne Wehler, a plant security man at the Airco facility, testified that they observed Allshouse deliver a case of beer to the Theresia gate pickets in the early morning hours of May 20, 1979, and Steward James Bennett joined the first shift employees on the picket lines on the evening of May 17, 1979. (140–143, 101–103, 88–90, 277–281, *130–*135, 87, 30–31).

19. On January 14, 1977, a wildcat strike, lasting three days, occurred at the Airco facility. The union neither instituted any disciplinary action against the leaders of the strike nor took any action to advise its members, by way of educational meetings or other means, of the illegality of such unauthorized work stoppages. The union has taken no action to discipline the leaders of the May, 1977 strike, nor has it taken any measures to prevent such future occurrences. (*152, 271, 138–139, 283–284, 30–31, 102–103, 281, 88–90, 101–102, 140–143).

20. Plaintiff incurred legal expenses and disbursements in attempting to end the illegal strike in the amount of $5,035.37. Alvin B. Coppolo, Esq. billed Airco $2000 for fees and $535.37 for disbursements for services rendered from May 18, 1977 to May 25, 1977, which included filing the suit for a temporary restraining order in the Court of Common Pleas of Elk County. Patrick J. Berrigan, who was retained as trial counsel in the action for a permanent injunction, billed Airco $2,500 for fees. (116–131).

21. Plaintiff incurred extraordinary expenses for plant security during the strike in the amount of $24,661.75. To coordinate the security within the plant, Airco engaged the services of Richard Frizzell who was paid $1,885.23 for his services and disbursements. Additional security personnel was secured from E. J. Burke Security of Buffalo, New York, at a cost of $12,815.00 and Pinkerton Detective, Inc., of Buffalo, New York, at a cost of $9,961.52. The St. Marys facility occupies approximately 100 acres. (PX 2, PX 12, 158–164).

22. Plaintiff incurred overtime charges for which no productive work was performed in the amount of $22,390.28. Several salaried personnel were besieged inside the plant during the course of the eight day strike performing such services as closing the facility, providing security, and other non-productive services for fellow employees and guards. The claim for overtime payment to these employees is set forth in PX 13–15. (16, 29, 74, 68, 98–99, 164–168, 182).

23. Plaintiff incurred salary expenses to idled employees in the amount of $127,055.86. From May 18 to May 25, 1977, approximately 350 to 400 salaried employees reported daily to the Hall Avenue parking lot and attempted to report to work. Although these employees were continuously ready to resume working, they were prevented from entering the plant by the pickets. During this period, these salaried employees were non-productive. Yet, each received his regular salary for May, 1977, without deduction for time not worked productively. The plaintiff computed that it was required to pay salaried persons at least $127,055.86 for time not worked as a

direct result of the strike. See PX 16. ( *145–147, 168–191, PX 7, 238–241).

24. Plaintiff incurred health insurance costs paid for idled employees in the amount of $15,525.04. Blue Cross and Blue Shield health insurance coverage is provided for all Airco employees employed at the St. Marys facility as a fringe benefit under the collective bargaining agreement. All of the employees were covered, without interruption, during the eight day unauthorized work stoppage. The cost of such coverage during the course of the strike is set forth in PX 17. (192–198).

25. Plaintiff paid real property taxes on idled property in the amount of $4,737.76 from May 17 to May 25, 1977. See PX 19. (209–210).

26. Plaintiff incurred demurrage charges of $514 to Conrail for railroad cars which were trapped in the Airco facility during the course of the strike. Airco was required to pay Hickman Williams and Co. $331.50 for truck freighting charges when the trucking firm's vehicle was prohibited from making its delivery by the pickets. These items resulted in a loss of $845.50. (211–213).

27. Plaintiff incurred extraordinary miscellaneous expenses in the sum of $4,079.92 and extraordinary usage of storehouse consumables valued at $247.43 for a total of $4,327.35. Plaintiff established the necessity of expending these monies in PX 21 and PX 22. (205, 214–216).

28. Plaintiff incurred increased power costs in the amount of $14,243.84. Airco pays for power at a rate expressed in mills per kilowatt hour and, generally, pays a lower rate per kilowatt with increased usage. PX 18 sets forth the monthly cost of power from April, 1976 through July, 1977 and establishes the total energy usage and cost per month. From that total cost was deducted a relatively insignificant sum sep-

arately metered for outside lighting. The net cost was then divided by the energy usage to arrive at a cost per kilowatt hour. A portion of this cost was attributable to a "Fuel Cost Adjustment" permitted by the Pennsylvania Public Service Commission in order to compensate utilities for inflation. Since this cost does not vary with usage, it was factored out of the mills per kilowatt hour rate, thereby arriving at a base rate which did vary with usage. PX 18 shows that the power usage for May, 1977, was substantially less than for other months. This reduced electrical usage was a direct result of the eight day work stoppage in May, thus resulting in Airco paying 1.04 mills per kilowatt hour more in May than in the preceding month. Comparisons with other months revealed a greater differential. Since there is a direct correlation between power usage and its cost, on the one hand, and production, on the other, Airco's cost of producing electrodes in May, 1977 was increased by the increased cost per kilowatt which resulted from decreased power usage which, in turn, was a direct result of the strike. Plaintiff established its increased cost in the amount of $14,243.84 by using April, 1977 as the comparable period for determining the computation. (198–208).

## DISCUSSION

The May 17–25, 1977 work stoppage at plaintiff's facility in St. Marys, Pennsylvania was admittedly a violation of the no-strike clause of the collective bargaining agreement then in effect between the parties.[1] Accordingly, the contentions of the parties surround the issues of liability for any damages caused by the illegal strike. The plaintiff seeks to impose liability on the union on the theory that the union failed to take every reasonable means to end the strike or even avert the walkout and that such failure or inaction amounted to a

1. At the trial, the union abandoned its defense that the work stoppage was a protected safety strike under *Gateway Coal Co. v. U.M.W.*, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). There was testimony that management efforts to curtail controlled punching, a procedure whereby workers increased their earnings by improperly punching cards, may have prompted the graphitizing crew members to walkout on May 17, 1977. ( *130, 52–54, 70–72). Airco contended that the "hot furnace" issue was a mere pretext.

breach of the collective bargaining agreement. The union, on the other hand, submits that it did everything possible to stop the wildcat strike and to encourage the union employees to return to work.

■ The union was under an express obligation to "cooperate with the Company in every way possible to prevent . . . and to terminate" any wildcat strikes and unauthorized work stoppages. Furthermore, by giving its no-strike pledge, the union was under an implied obligation to use all available means to terminate an unlawful strike begun by its members. *Eazor Express v. Teamsters*, 520 F.2d 951 (3rd Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976) (hereinafter *Eazor Express*). In *Eazor Express*, the court construed a no-strike clause as impliedly obliging the union to implement it, as follows:

> . . . collective bargaining agreements . . . impose a continuing day-to-day obligation on the parties to fulfill their terms in good faith. (citations omitted). This is certainly true with respect to the obligation that there should be no strike pending the use of the grievance procedure. Accordingly, in the case of an unauthorized strike against their employer by all the members of a union who are employed by that employer, their union may not disclaim responsibility for the losses suffered by the employer as a result of the strike unless and until it has exhausted all reasonable means within its power to bring that unlawful action to an end. A no-strike agreement would be illusory indeed were a union to be permitted to avoid all responsibility under it for the duration of a prolonged strike which was being carried on by the concerted action of all its members employed in the struck operation, merely because the strike was not initially authorized or called by the union as an organization or by those of its officers who were specially empowered to do so. Rather than to construe a contract as producing such a result, the courts will favor a construction making the mutual

promises binding and giving the contract legal effect. (citations omitted). 520 F.2d 959–960.

■ In the present case we find that the union did not fulfill its express and implied obligations under the collective bargaining agreement to use all reasonable means to terminate the strike. The record clearly establishes that the sole means employed by the union officials to endeavor to end the strike was the use of verbal appeals to return to work, which the striking members rejected out of hand. No stronger measures were ever utilized, although they were available to the defendant. Thus, no effort was made to discipline or remove the stewards who were organizing and leading the strike, to suspend or fine the striking members, to publicly disassociate the union from the strike, to call a general membership meeting or meeting of striking employees, or to communicate with union members by telegram or letter.

■ The union contends that the use of stronger measures would not have been successful in ending the strike. In *Eazor Express*, the court addressed the argument, as follows:

> The point here is that the unions were contractually obliged to carry out their agreement that there should be no strike by employing *all* reasonable means available to them to seek to end the existing unauthorized strikes and this they failed to do. 520 F.2d 964.

The union cannot be heard to say that such measures, if employed, would not have been successful in ending the strike in this case and that, accordingly, it was not necessary to try them in order to absolve itself of the responsibility for the consequences of the May 17, 1979 wildcat strike. While the union would distinguish *Eazor Express* for the reason that proven means of successfully ending the strike were available to Teamsters Local 241, a defendant in that case, defendant herein failed to take any action during the course of and following the wildcat strike of January 17, 1979. To allow the union to avoid liability for the May 17, 1979 wildcat strike because various

measures at its disposal were untested in a previous wildcat strike would be to encourage inaction and render the union's contractual commitment to take all appropriate measures to end an unlawful strike meaningless.

■ The participation in the May 17, 1979 wildcat strike by virtually all of the defendant local's members and several of their stewards who were employed at Airco's St. Marys facility suggests the availability of the mass action theory as an alternative basis for union liability. *United States Steel Corp. v. U. M. W. A., District 20, et al*, 598 F.2d 363 (5th Cir. 1979). In *Eazor Express*, the court explained the mass action theory, as follows:

> When all the members of a union employed by a given employer engage in a concerted strike not formally authorized by the union, as happened here, many courts hold the union responsible on the theory that mass action by union members must realistically be regarded as union action. The premise is that large groups of men do not act collectively without leadership and that a functioning union must be held responsible for the mass action of its members. 520 F.2d 963.

The mass action theory provides an additional and separate basis for a finding of union liability in this case.

■ The common law of agency, expressly made available to the parties to a breach of contract suit by Section 301(b) and (e) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(b) and (e), provides a third distinct basis for a finding of union liability in this action. The union is responsible for the acts of its agents where such acts are committed within the scope of their authority. *Black Diamond Coal Mining Co. v. U. M. W. A., Local 8460*, 597 F.2d 494, 495 (5th Cir. 1979). Bernie Heiberger, a union steward, encouraged the crew members in the graphitizing department to participate in the walkout and personally led the walkout. William R. Smith, the Chief Steward, had overheard Heiberger's complaints about the working condi-

tions and he had personally inspected Furnace # 1407, having been advised that some of the crew members complained that # 1407 was "too hot" to undermine. Smith, the highest ranking union official at plaintiff's St. Marys facility, was aware of the situation as it developed and yet, he failed to take any action to discourage Robert Klaiber or any of the crew members from walking off the job during the critical hours preceding the strike. Following their 6:00 p. m. meeting with William Daugherty, the Personnel Manager of the Airco facility, and while the pickets were assembling outside of the plant, Smith and William Allshouse, Assistant Chief Steward, spent ten to fifteen minutes at a softball field visiting with Smith's wife and daughter. They failed to contact Alfred A. Didonato, the local president, and inform him of the walkout. Smith played no role during the course of the strike except for accompanying Didonato to the two unsuccessful meetings with management at the plant. Allshouse was observed bringing a case of beer to the Theresia gate pickets on May 20, 1979. Their record of inactivity, if not utter disregard for the seriousness of the situation, amounts to tacit approval of the work stoppage. Where, as in this case, union functionaries have instigated, participated in, and actively encouraged members to continue their unauthorized work stoppage, the court has based a finding of liability on the common law of agency. *Eazor Express v. Teamsters, supra* at 520 F.2d 963–964.

■ Finally, the circumstances surrounding this strike show that the defendant condoned or ratified the illegal activity, and therefore must be held responsible for its failure to take measures to end the strike. *United States Steel Corp. v. U. M. W. A.*, 519 F.2d 1249, 1256 (5th Cir. 1975), *Reh. and reh. en banc denied*, 526 F.2d 377 (1977). A principal may ratify, by subsequent conduct inconsistent with repudiation, an agent's unauthorized acts earlier disaffirmed by the principal in order to implement federal labor policy and regardless of the contractual limitations upon the

authority of the union's subordinate officials and stewards. *Eazor Express v. Teamsters, supra* at 520 F.2d 964. When management refused to accede to the union's demands for amnesty for the strikers, the union officials took no further action to bring the strike to an end. The union failed to take any action against the instigators following the issuance of the permanent injunction. Those stewards who refused to cross the picket lines were neither reprimanded nor removed by the officers of the union.

We have heeded the Circuit's admonition that, in determining union liability for unauthorized strikes in suits under the LMRA, the district court must inquire into the reasonableness of attempts by local officials to avert or halt wildcat activity by membership with what is reasonable depending on the context of the case. *United States Steel Corp. v. U. M. W. A.*, 534 F.2d 1063 (3rd Cir. 1976), *Reh. and reh. en banc denied*, (1976). We have concluded, based on the foregoing, that the union failed to exhaust all reasonable means within its power to bring that unlawful action to an end.

Having determined the question of liability, we now turn to the question of damages. Section 301 of the LMRA, 29 U.S.C. § 185(b), provides for the award of compensatory damages when a union violates a no-strike clause. The measure of damages recoverable in this action is governed by *Eazor Express*:

> the actual loss sustained by the plaintiff as a direct result of the breach and which may reasonably be supposed to have been in the contemplation of the parties as the probable result of such a breach at the time the agreement was made. 520 F.2d at 966.

Because a collective bargaining agreement is a contract and enforceable as such, the traditional criteria for the ascertainment of damages where a contract has been breached—foreseeability and proximate cause—are applicable. 11 Williston on Contracts 3rd Ed. Jaeger, 1968, § 1362, p. 32.

Plaintiff has the burden of proving what actual losses were suffered as a result of an unlawful strike. *Foam & Plastics Div., Tenneco Chemicals, Inc. v. Teamsters, Local 401*, 520 F.2d 945, 949 (3rd Cir. 1975) (hereinafter *Tenneco*). The courts generally require only a reasonable estimate of the damages rather than a mathematical certainty. See Annotation, 92 A.L.R.2d 1232. It is well established that the district court is the trier of the facts and that it is within its province to determine which items are reasonable and which are not. *Tenneco v. Teamsters, supra* at 520. F.2d 950. Where, as here, the fact of damages has been established, the court may approximate the damages on the basis of just and reasonable inferences from the evidence. *Wagner Electric Corp. v. International Union of Electrical, Radio & Machine Workers*, 496 F.2d 954, 957 (8th Cir. 1974).

Plaintiff offered a great deal of evidence on the subject of its losses resulting from the strike. The evidence included the plaintiff's accounting records, testimony by a company accountant with respect thereto, and much other material. Defendant introduced no evidence either to contradict plaintiff's damage claim or to assist the court in making its assessment. The following elements were proven by competent evidence.

1. Plaintiff's claim for damages in the sum of $127,055.86 expended for salaries of idled employees is recoverable. Wages are a necessary expenditure incurred by the plaintiff for which it received no return in productive labor because its employees were prohibited from working by the pickets and such expense constitutes a proper item of damages under *Tenneco*. Plaintiff's method of computing such loss, by dividing the total payroll by the work days and multiplying the per diem figure by the work days lost, has received judicial approval. *Structural Steel v. Shipmen's Local 545*, 172 F. 354 (D.N.J.1959). Plaintiff's additional claim for damages in the amount of $22,390.28 for overtime charges made necessary by the strike is a proper damage claim under *Tenneco*. Some of plaintiff's employees remained within the

facility for an extended time protecting equipment and performing other non-productive functions. This element of plaintiff's claim was proven by competent evidence.

2. Plaintiff seeks recovery for expenses for plant security in the amount of $24,-661.80, an item of extra expense caused by the wildcat strike, and recoverable under *Tenneco*. The company procured services of outside security forces to protect its plant and personnel and, since the union offered no evidence to rebut the reasonableness of the expenses under the circumstances, the item should be allowed as proven.

3. Plaintiff incurred demurrage charges in the amount of $514 as a direct result of the wildcat strike, which expense is a recoverable item. *International Union of Operating Engineers v. Dahlem Construction Co.*, 193 F.2d 470, 472 (6th Cir. 1951). Plaintiff incurred truck freighting charges in the amount of $331.50, diverse miscellaneous expenses in the amount of $4,079.92, plus an expense in the sum of $247.43 for storehouse consumables, which expenses all were directly attributable to the strike. These expenses were proven by competent evidence and are recoverable in this action. *Wagner Electric Corp. v. International Union of Electrical, Radio & Machine Workers*, 496 F.2d 954 (8th Cir. 1974); *United Electrical, Radio & Machine Workers v. Oliver Corp.*, 205 F.2d 376 (8th Cir. 1953).

4. Plaintiff seeks recovery for Blue Cross and Blue Shield costs which it paid for both union and management employees idled by the strike in the amount of $15,525.04. Group health insurance is a recoverable fixed expense in a § 301 action for breach of a no-strike clause in a collective bargaining agreement, under *Tenneco*, and plaintiff has proven this element of damages by competent evidence. Accordingly, plaintiff is entitled to recovery.

5. Plaintiff incurred the cost of real property taxes, computed at $4,737.76, upon its idled property during the course of the strike. Plaintiff has proven its claim for such payments and is entitled to recovery of the same under *Tenneco*.

6. Plaintiff seeks recovery for reasonable legal expenses and disbursements in the sum of $5,035.37, which were incurred in an effort to end the illegal strike. Plaintiff established that all of this amount was incurred in connection with the work stoppage. Such expenses and disbursements are recoverable as an item of damages in a § 301 action. *Eazor Express v. Teamsters, supra*, at 520 F.2d 972; *Sheet Metal Workers Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101, 110 (5th Cir. 1967). This item must, accordingly, be allowed.

7. Plaintiff established by the weight of the evidence that the illegal strike resulted in higher power costs on a unit basis for the month of May, 1977, than for the preceding months in the amount of $14,243.84. In *Electrical Workers v. Oliver Corp., supra*, the court allowed recovery for unused power which had been purchased by the company. We find that this power expense claim has been proven and that plaintiff is entitled to recover such costs.

8. In support of its claim for recovery of depreciation expenses, plaintiff relies on *Tenneco v. Teamsters, supra* and *Mason-Rust Corp. v. Building Material Local 682*, 324 F.Supp. 839 (E.D.Mo.1971). Neither case however, holds that depreciation expenses are recoverable. In remanding the question of damages in *Tenneco*, the court observed that the item of depreciation "is of very small magnitude, i. e. $69." 520 F.2d at 949. In dicta, the court listed several items that other courts have included as elements of damages in similar suits such as actual costs of operation and overhead expenses. Even assuming that depreciation expenses resulting from an illegal work stoppage were an item of damages within the contemplation of the parties at the time they entered into their collective bargaining agreement, we find that plaintiff's claim is speculative in this case.[2]

---

2. In both *W. L. Mead, Inc. v. Teamsters*, 230 F.2d 576 (1st Cir. 1956), *cert. denied*, 352 U.S. 802 (1956) and *Roadway Express, Inc. v. High-* *way Truck Drivers and Helpers, Local 107*, 299 F.Supp. 1058 (E.D.Pa.1969), on which plaintiff relies, the courts allowed recovery for deprecia-

Plaintiff's depreciation figures were based on the out-of-pocket costs it expended to build the equipment, depreciating historical costs on a straight line basis. Each depreciable item of property was identified with a rate assigned to correspond to the actual expected useful life of the item. Plaintiff claims that total depreciation, as set forth in PX 23, reflected a figure of $224,095.18 per month or $7,228.87 for each of the 31 days of May. Plaintiff seeks recovery for incurred uncompensated depreciation costs during the eight day strike in the amount of $57,830.97. We find that this figure is speculative because it fails to reflect an actual monetary reduction in value of the equipment in plaintiff's facility during the eight day strike. By failing to differentiate between depreciating idle and productive equipment which sustains wear and tear, plaintiff equates compensated and uncompensated depreciation costs. Accordingly, plaintiff's claim for depreciation costs must be denied.

9. Finally, plaintiff seeks recovery for prejudgment interest from May 25, 1977, the date on which the strike ended. In *Eazor Express v. Teamsters, supra*, the court stated:

> The general rule is that when the damages resulting from a breach of contract are ascertainable with mathematical precision prejudgment interest is awardable as of right. If, however, the claim is not for a liquidated sum but is nonetheless pecuniary rather than personal in its nature many courts will add prejudgment interest to the amount which they find would have been just compensation at the time of the breach, when in the exercise of their discretion it appears necessary to do so in order to arrive at fair compensation at the time of judgment. (Citations omitted). 520 F.2d 973.

*Eazor* holds that this is an "appropriate rule for discretionary application as a matter of federal law in actions brought under section 301 of the Labor Management Relations Act for breaches of labor agreements." We find that plaintiff is entitled to prejudgment interest in this case in order to arrive at fair compensation at the date of judgment.

10. The defendant did not press the issue of mitigation of damages during trial. The doctrine of mitigation of damages has a limited application to situations in which a union or its members have breached a no-strike agreement by carrying on a strike in violation of the agreement. *Eazor Express v. Teamsters, supra,* at 969–970. It was not unreasonable for plaintiff to reject defendant's demand for amnesty; Airco is not required to take steps which it may reasonably regard as likely to have the effect of encouraging the strikers to repeat such contract-breaking breaches of industrial peace in the future. Plaintiff was justified in seeking immediate injunctive relief, to end the strike, particularly in view of the previous wildcat strike by members of Local 502 at the St. Marys facility. In the present case, the plaintiff did all that could reasonably be required of it to end the strike and thereby to mitigate the damages.

11. Defendant contends that allowance should be given to the union for a reasonable period of time within which it could have ended the strike. Defendant argues that there must be some time lag between the inception of the strike and the starting point of defendant's liability or the point at which the union was called upon and failed to exert all reasonable efforts to end the strike. Defendant relies on *Eazor Express*, wherein the court determined that such a time lag extended for a period of 48 hours from the time of the unions' notification of the wildcat strike to the point at which they should have known that their

tion of company property resulting from prolonged strikes in violation of collective bargaining agreements. In *W. L. Mead*, the court reduced the plaintiff's claim for depreciation expenses as "excessive." In this action plaintiff seeks recovery for depreciation expenses which it allegedly incurred, not during a prolonged strike, but rather during the course of a relatively brief, eight day work stoppage.

diplomacy and persuasive efforts had failed and that the strike demanded effective sanctions. Officials of each of the three defendant unions had informed those within their charge of the illegality of their action and had urged the men to return to work. The court concluded that within 48 hours of the inception of the strike the unions should have been aware of the fact that resort to halfway measures had failed. The court cautioned against adopting an ironclad rule under all circumstances. Allowance for a grace period is particularly inappropriate in this case where the officials of the defendant local were in a position to end the strike in its nascent stage or even prevent the walkout but failed to take any persuasive measures within 24 or 48 hours of the strike. Furthermore, one of the union stewards within the plant encouraged the men to strike and led the walkout of the crew members of the graphitizing department. While an international union may not be required to bring forth its most effective sanctions immediately upon notification of a strike, the defendant local should have escalated its measures to include more than the mere perfunctory responses which the evidence discloses. Defendant can not be given any credit for any period following the inception of the strike where it failed to take any effective action during the pendency of the strike.

## CONCLUSIONS OF LAW

1. The plaintiff is an employer and the defendant is a labor organization within the meaning of the Labor-Management Relations Act, 29 U.S.C. § 141, et seq.

2. Jurisdiction in this court is based on section 301 of the LMRA, 29 U.S.C. § 185.

3. The defendant breached its contractual obligation to utilize all reasonable means within its power to bring the illegal strike which occurred on May 17, 1977, to an end, and is, accordingly, liable to the plaintiff for its proven damages.

An appropriate order will be entered.