**CALIFORNIA TRUCKING ASSOCIATION,**
Plaintiff-Appellee,

v.

**BROTHERHOOD OF TEAMSTERS & AUTO TRUCK DRIVERS, LOCAL 70,**
Defendant-Appellant.

**GRANNY GOOSE FOODS, INC., et al.,**
Plaintiffs-Appellees,

v.

**BROTHERHOOD OF TEAMSTERS & AUTO TRUCK DRIVERS, LOCAL 70,**
Defendant-Appellant.

No. 77–3445.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 1980.

Decided Oct. 19, 1981.

As Amended Dec. 10, 1981 and June 2, 1982.

Rehearing and Rehearing En Banc Denied June 3, 1982.

---

David A. Rosenfeld, Victor J. Van Bourg, Van Bourg, Allen, Weinberg & Roger, San Francisco, Cal., for defendant-appellant.

George J. Tichy, II, Richard H. Harding, Littler, Mendelson, Fastiff & Tichy, San Francisco, Cal., for plaintiffs-appellees.

Before ELY and TANG, Circuit Judges and GRANT *, District Judge.

TANG, Circuit Judge:

This is an action arising under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), to recover damages caused by a claimed violation of a collective bargaining agreement. Brotherhood of Teamsters & Auto Truck Drivers, Local 70 [Local 70] appeals the district court's judgment determining Local 70's liability in damages for breach of the collective bargaining agreement running between it and the employers, California Trucking Association and two manufacturing concerns, Granny Goose Foods, Inc. and Sunshine Biscuit, Inc. [the employers]. Although each issue spawns several sub-issues, the appeal can be reduced to three central questions: (1) whether the district court erred in entertaining the employers' damage actions instituted without prior resort to grievance procedures contained in the collective bargaining agreement; (2) whether the district court erred in its determination that each work stoppage litigated was in breach of the agreement; and (3) whether the damage formulae adopted by the lower court were erroneous. We hold that the district court had jurisdiction over the employers' damage action because Local 70 repudiated its agreement in proceedings before the lower court. We also hold that the court correctly determined that the work stoppages were in breach of the agreement. We affirm the district court's computation of damages save and except as to the issue of lost customers. Because the trial court failed to determine whether overhead should be deducted from projected lost gross profits, on that issue we reverse and remand.

I.

On April 1, 1967, the parties entered collective bargaining agreements entitled "National Master Freight Agreement" (NMFA) and "Local 70 Pickup and Delivery Supplemental Agreement" (Supplemental Agreement). The court below found that although the agreements ostensibly bound the principals for the term April 1, 1967 to March 31, 1970, Article 61 of the Supple-

---

* The Honorable Robert A. Grant, Senior United States District Judge for the Northern District of Indiana, sitting by designation.

mental Agreement provided that the term of the agreement was subject to and controlled by all the provisions of Article 37 of the National Master Agreement which in turn allowed annual extensions of the agreements absent notice by any of the parties to the contrary.[1] The trial court also found that the 1967–1970 contracts were in effect during the period April 1, 1970, to May 18, 1970 (representing an extension of the original agreement by nearly two months) because neither side proffered notice of intent to discontinue the contracts.

Pursuant to section 2 of Article 37 of the NMFA, however, the parties took steps to amend the contracts in early 1970.[2] These negotiations proceeded without impasse until a tentative agreement was achieved on April 2, 1970. The agreement was consummated when the union acquired the requisite ratification of the full membership of teamsters on May 18, 1970.

The district court found that under the terms of the contract only the *monetary* items contained in the agreement would have retroactive effect to April 1, 1970. In contrast, the court's interpretation of the agreement specifically disallowed retroactivity as to the *nonmonetary* language of the contract. Those provisions were found to be prospective only, dating from May 18, 1970, the date of ratification. The nonmonetary terms of the 1967–1970 contract, consequently, were deemed to be effective during the interim period, April 1, 1970 to May 18, 1970.[3]

Although no impasse had been reached in the negotiations for the amendments to the contracts, Local 70, disenchanted with national negotiations and in apparent pursuit of a separate contract, initiated strike and picket activity against the trucking plaintiffs on or about April 1, 1970. As a consequence of a temporary restraining order issued by the Superior Court of Alameda County, the picketing ceased on April 4, 1970. Because of a mass "sick-in" executed on April 6 and 7, however, the work stoppage did not cease until April 8, 1970. Local 70 reinstated its work stoppage against the trucking association on May 8, 1970, and expanded the activity on May 14, 1970, to encompass the snack food industry plaintiffs, Granny Goose and Sunshine Biscuits. The work stoppages against the employers, which did not fully terminate until June, resulted in a complete cessation of virtually all revenue-producing operations during the period of the work stoppage.

Both the trucking association and the snack food plaintiffs' claims were removed from Alameda Superior Court to the United States District Court for the Northern District of California and there consolidated. After the claims were removed and consolidated, the trucking plaintiffs filed an unfair labor practice charge against Local 70 based on the April and May events. As an upshot of the filing, the National Labor Relations Board (the Board) issued complaint against the union. The NLRB trial examiner found that Local 70's April and May activity had violated the NLRA as an attempt to break the employers away from the multi-employer bargaining unit. The union's appeal to the NLRB was unsuccessful and its subsequent noncompliance with the NLRB order was countered by this court's judgment en-

---

**1.** Article 37 of the NMFA provides that it shall remain in force from "April 1, 1967 to and including March 31, 1970, *and shall continue from year to year thereafter unless written notice of desire to cancel and terminate the agreement is served by either party upon the other at least 60 days prior to the date of expiration.*" (Emphasis added)

**2.** Section 2 provides:

Where no such cancellation or termination notice is served and the parties desire to continue said Agreement but also desire to negotiate changes or revisions of this Agree-

ment, either party may serve upon the other a notice of least sixty (60) days prior to March 31, 1970 … advising that such party desires to revise or change terms or conditions of such Agreement.

**3.** Thus, the national monetary settlement involving hourly rates, mileage rates, cost of living, health and welfare, pensions, holidays and vacation became effective on April 1, 1970, while nonmonetary revisions, such as those involving the grievance machinery, became effective on May 18, 1970.

forcing the Board's order.[4] The union later moved in district court for dismissal of the consolidated actions but the court denied the motion. Although the district court stayed proceedings with respect to claims arising on or after May 18, 1970, it conducted trial without jury as to the earlier claims, and found Local 70 liable in damages in excess of three million dollars. From that disposition, Local 70 appeals.

## II

We must first determine whether the district court erred in holding that the employers could maintain a damages action under section 301 in lieu of arbitration. Review of this issue must begin with the language of the collective bargaining agreement.

Section 8(d) of the NMFA provides that:

In the event of strikes, work stoppages, or other activities which are permitted in a case of deadlock, default or failure to comply with majority decisions, no interpretation of this agreement by a tribunal shall be binding upon the Union or affect the legality or lawfulness of the strike unless the Union stipulates to be bound by such interpretation. *Nothing herein shall prevent legal proceedings by the employer where the strike is in violation of this agreement* (emphasis added).

The employers contend that this language permits a damages action in district court without prior resort to arbitral grievance procedures. Local 70 disputes this contention, arguing that arbitration is a condition precedent to an action in district court. In turn, the employers argue that even if Local 70's assertions are correct, it cannot now rely on grievance procedures it expressly repudiated in pleadings and motions before the district court.

Specifically, Local 70 argues that two provisions in the NMFA require arbitration prior to suit in district court. First, Local 70 argues that the word "herein" in section 8(d) of the NMFA is referable only to the NMFA and not its Supplemental Agreements. As a consequence, argues Local 70,

the district court could not ignore the mandatory grievance procedures enumerated in the Supplemental Agreement. Second, Local 70 contends that the words "strike" and "in violation of this agreement" must first be construed before suit can be brought in district court and that only the arbitrator can determine the significance of the contested language. Resolution of these two questions hinges initially on a purely legal issue—whether the district court has the power to determine the existence and scope of a contract to arbitrate.

### A.

■ The Supreme Court has repeatedly held that, absent a contrary provision in the collective bargaining agreement, the existence and scope of a contract to arbitrate are questions for the court to determine in the first instance:

The Congress * * * has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Under the court's decisions, whether or not the parties are bound to arbitrate, as well as what issues they must arbitrate, is a matter to be determined by the court on the basis of the contract entered into by the parties. *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962). *See International Union of Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491–92, 92 S.Ct. 1710, 1712–1713, 32 L.Ed.2d 248 (1972); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 912, 11 L.Ed.2d 898 (1964); *Local Freight Drivers v. Braswell Motor Freight Lines, Inc.*, 422 F.2d 109, 112 (9th Cir.), cert.

---

**4.** *NLRB v. Brotherhood of Teamsters & Auto Truck Drivers*, 470 F.2d 509 (9th Cir. 1972), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 54 (1973).

*denied,* 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970). Consequently, a determination that the collective bargaining agreement permits a damages action in district court in lieu of arbitration is well within a district court's power. *See Atkinson,* 370 U.S. at 241–42, 82 S.Ct. at 1320–1321, (1962); *Johnston-Tombigbee Furniture Mfg. Co. v. United Brotherhood of Carpenters and Joiners,* 596 F.2d 126, 128–129 (5th Cir. 1979); *Howard Electric Co. v. International Brotherhood of Electrical Workers,* 423 F.2d 164, 165–66 (9th Cir. 1970); *Los Angeles Paper Bag Co. v. Printing Specialties and Paper Products Union,* 345 F.2d 757, 759 (9th Cir. 1965); *Stokely-Van Camp, Inc. v. United Steel Workers of America,* 480 F.Supp. 48 (E.D.Tenn.1979). The district court in this case clearly had jurisdiction to determine the existence and scope of the contract to arbitrate.[5]

### B.

Having properly exercised jurisdiction to determine the scope of the collective bargaining agreement, the court below held that it could entertain the employers section 301 damages action because: (1) section 8(d) permitted "legal proceedings by the employer" when "the strike is in violation of this agreement"; and (2) in any event, Local 70 repudiated its rights and obligations under the collective bargaining agreement, thereby waiving its right to compel arbitration prior to suit in district court. We turn first to the lower court's second holding.

*House Systems, Inc. v. International Brotherhood of Firemen & Oilers,* 607 F.2d 1104, 1109–12 (5th Cir. 1979) (extension and notice provisions of agreement construed by court); *Newspaper Guild of Greater Philadelphia v. Central States Publishing Co.,* 451 F.Supp. 1112, 1114–1115 (E.D.Pa.1978) (where 1973–75 contract expired, court, not arbitrator had duty to determine whether parties agreed to "abide by the terms of the old contract on a day-to-day basis"); *Milwaukee Typographical Union v. Madison Newspapers, Inc.,* 444 F.Supp. 1223, 1226 (W.D.Wis.1978), *aff'd,* 622 F.2d 590 (7th Cir. 1980) (court has jurisdiction to determine whether contract expired, whether grievance "arose" under the contract, and whether the obligation to arbitrate survived the agreement).

The court below found that the 1967–1970 agreement, although facially set for expiration on March 31, 1970, continued in force until May 18, 1970 and that only the monetary provisions of the 1970–1973 agreement would have retroactive effect to April 1, 1970. Without debating the propriety of the court's conclusion, Local 70 asserts that the lower court's determination was based exclusively upon parole evidence—a letter from Teamster Vice-President Frank Fitzsimmons stating that the nonmonetary clauses of the 1970–73 agreement would be effective May 18, 1970. We need not determine whether the evidence submitted at trial on this issue was parole evidence because this court has previously found that parole evidence and evidence of bargaining history are relevant and admissible on the issue of arbitrability. *See Communications Workers of America v. Pacific Northwest Bell Telephone Co.,* 310 F.2d 244, 247 (9th Cir. 1962); *Association of Industrial Scientists v. Shell Development Co.,* 348 F.2d 385, 388 n.4 (9th Cir. 1965).

---

**5.** Local 70 also asserts that the retroactivity of the 1970–1973 agreement was a procedural question to be determined only by the arbitrator. Local 70 bases its contention on section 8(f) of the 1970–1973 agreement, which provides:

> All local, area and national grievance committees as constituted under this agreement shall have the jurisdiction and power to decide grievances which arose under the preceding agreements and supplements thereto, applying, however, the contract under which the grievance arose.

Local 70's claim is untenable. Unless parties have *explicitly* agreed to the contrary, it is a matter for the courts, not the arbitrator, to decide whether the parties have agreed to submit specific issues to arbitration. *John Wiley & Sons,* 376 U.S. at 546–47, 84 S.Ct. at 912; *Leyva v. Certified Grocers of California, Ltd.,* 593 F.2d 857, 861 (9th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Although this court has countenanced submission of the issue of arbitrability itself to the arbitrators when the contract specifically so provides, *see Amalgamated Clothing & Textile Workers Union v. Ratner Corp.,* 602 F.2d 1363, 1366, 1370 (9th Cir. 1979) ("[a]ny and all matters in dispute, including a dispute concerning the interpretation or application of the arbitration provision") there is no specific clause in this case limiting the district court's power to determine the retroactivity of the 1970–1973 agreement. Consequently, the district court properly addressed the question of retroactivity free from the restraining influence of any provision expressly denying it jurisdiction. *See Nolde Bros., Inc. v. Bakery & Confectionery Workers Union,* 430 U.S. 243, 250, 97 S.Ct. 1067, 1071, 51 L.Ed.2d 300 (1977) (court has jurisdiction to determine if grievance "arose" under expired contract); *Kaufman & Broad*

In rendering judgment, the district court held that even if the collective bargaining agreement required submission of damages actions to the grievance procedures, Local 70's express repudiation of the collective bargaining agreement released the employers from any obligation to arbitrate. Specifically, the court found that Local 70 consistently repudiated the entire collective bargaining agreement by denying throughout proceedings before the court that it was bound by the agreement.[6] Before determining whether an adequate factual base supports its findings of subsidiary facts, we examine the district court's conclusion that it had jurisdiction to resolve the question of repudiation.

◼ Although there has been some confusion in the past, it is now settled that the issue whether repudiation has occurred must normally be submitted to arbitration when the contract calls for arbitral resolution of questions arising under the collective bargaining agreement. *Rochdale Village, Inc. v. Public Service Employers Union,* 605 F.2d 1290, 1297 (2nd Cir. 1979); *Auto, Marine & Specialty Painters v. Bay Area Sealers, Inc.,* 577 F.2d 609, 610 (9th Cir. 1978); *H & M Cake Box, Inc. v. Bakery & Confectionery Workers International Union,* 493 F.2d 1226, 1231 (1st Cir.), *cert. denied,* 419 U.S. 839, 95 S.Ct. 68, 42 L.Ed.2d 66 (1974). *But cf. Brannon v. Warn Bros., Inc.,* 508 F.2d 115, 120 (9th Cir. 1974) (repudiation by employees is normally question for court to resolve) (citing *Vaca v. Sipes,* 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967)). Nevertheless, at least one court has carved an exception to the general rule favoring the presumptive arbitrability of repudiation questions. In *Reid Burton Constr., Inc. v. Carpenters Dist. Council,* 535 F.2d 598, 602–04 (10th Cir.), *cert. denied,* 429 U.S. 907, 97 S.Ct. 272, 50 L.Ed.2d 188 (1976), *appeal from remand,* 614 F.2d 698, 700–02 (1980), the Tenth Circuit reasoned that a distinction must be demarcated between repudiations arising before the arbitrator or during the course of a contractual relationship and repudia-

tions occurring in proceedings directly before a court. The court in *Reid Burton* held that the district court, not the arbitrator should rule on the question of repudiation when the asserted rejection of the contract occurs before the court.

In response to an employer's section 301 damages action for breach of a collective bargaining agreement, the union in *Reid Burton* claimed that it was not a party to the agreement and counterclaimed, claiming that the employer had failed to exhaust the mandatory arbitral procedures. Despite this latter contention, the union consistently denied before the district court its status as a party to the employer's damages action for more than a year, although it participated in numerous hearings, pretrial conferences, motions and other pleadings. Moreover, the union failed to demand enforcement of the collective bargaining agreement's arbitration clause. *Reid Burton,* 614 F.2d at 703. The employer, in turn, claimed that the union's conduct constituted a repudiation of the collective bargaining agreement and its arbitration procedures, thereby freeing it from any obligation to pursue the arbitral grievance machinery. *Id.*

The Tenth Circuit in *Reid Burton* commenced its analysis of this question by reviewing appropriate precedents, focusing primarily on the Supreme Court's opinion in *International Union of Operating Engineers v. Flair Builders, Inc.,* 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972). After carefully examining that case, the court concluded that *Flair Builders* could be "confined to the proposition that certain broadly-worded arbitration clauses require the arbitration of equitable defenses arising out of the formation of a collective bargaining agreement or the processing of a grievance, be they intrinsic procedural questions or extrinsic questions ...." *Reid Burton,* 535 F.2d at 603 (footnote omitted). Under this construction, concluded the *Reid Burton* court, not every question concerning equitable defenses must be relegated to arbitration:

**6.** *See* Note 10, *infra.*

The equitable defense ... arose from alleged "evasive" and "dilatory" pleading tactics by the unions in the district court proceedings, specifically the fact that the unions claimed that Local 1340 was not a party to the collective bargaining agreement, later admitting that while Local 1340 was not a party it was still bound by the provisions of the agreement. Courts must, of course, maintain judicial control of their own proceedings. Such power, we assert, is broad enough to include a court's determination of the validity of equitable defenses arising out of the action of parties before the court. To hold otherwise would unnecessarily hamper a court's control of its proceedings.

*Reid Burton*, 535 F.2d at 603. The court also concluded that even if the litigants agreed to refer the question of such repudiation to arbitration, jurisdiction would still be proper only in district court because the parties' prerogative to contract could not encompass the power to limit directly the exercise of a court's inherent judicial function. *Reid Burton*, 535 F.2d at 604.

■ We have found substantial support in both state and federal court decisions for the Tenth Circuit's conclusion.[7] Moreover, we find the reasoning that underpins the holding in *Reid Burton* compelling. Maintenance of control and supervision over court proceedings is an inherent judicial function that surely includes the power to determine the validity of equitable defenses arising from the parties' conduct before the court. We therefore adopt the limited exception to arbitrability fashioned in *Reid*

*Burton.* Accordingly, we affirm the district court's conclusion that it had jurisdiction to resolve a repudiation defense based on conduct occurring before it.

### C.

Our determination that the trial court had jurisdiction over the repudiation issue does not conclude our inquiry, however, for we must also review the court's holding that Local 70's conduct constituted repudiation. We conclude that the court correctly applied the principles of repudiation, waiver and estoppel and that its finding of fact were not clearly erroneous.

■ As the trial court correctly observed, the effect of a repudiation upon the repudiator's right to arbitration is contingent on the character of the alleged repudiation and the reasons offered in justification:

One who flatly repudiates the provision for arbitration itself should have no right to the stay of a court action brought by the other party. But mere nonperformance, even though unjustified, is not *per se* a 'repudiation.' One who asserts in good faith that the facts justify him in refusing performance of other provisions in the contract should not thereby lose his right to arbitration that he would otherwise have had. *There is no inconsistency in his demanding arbitration at the same time that he asserts his legal privilege not to proceed with performance.*

*Drake Bakeries, Inc. v. American Bakery & Confectionery Workers International*, 370 U.S. 254, 263 n.10, 82 S.Ct. 1346, 1351, 8

---

**7.** *See United Steelworkers of America v. Mesker Brothers Industries, Inc.*, 457 F.2d 91, 95 (8th Cir. 1972) (federal court cannot refuse to exercise jurisdiction where the parties have waived right to arbitrate); *Alloy Cast Steel Co. v. United Steelworkers of America*, 429 F.Supp. 445, 450 (N.D. Ohio 1977) (by failing to assert their contract right prior to trial union waived any right it possessed to require resolution of dispute through arbitration); *Necchi Sewing Machine Sales Corp. v. Carl*, 260 F.Supp. 665, 667–68 (S.D.N.Y. 1966) (court must decide questions of laches and waiver arising out of conduct before it); *Brothers Jurewicz, Inc. v. Atari, Inc.*, Minn., 296 N.W.2d 422, 427–28 (1980) (when arbitration request is made after litigation has commenced and party opposed to arbitration claims laches or waiver predicated solely upon participation in lawsuit by parties seeking arbitration, limited exception to general rule that issue of whether right to request arbitration is lost due to laches and waiver should be decided by arbitrator exists giving trial court jurisdiction to decide the issue); *Butchers Union Local 532 v. Farmers Market*, 67 Cal.App.3d 905, 928–29, 136 Cal.Rptr. 894, 899–900 (1977) (defendant wishing to assert right to arbitration must urge it as an affirmative defense in its answer and court has power to determine whether failure to do so amounts to a waiver).

L.Ed.2d 474 (1962) (quoting 6 Corbin, Contracts § 1443, at 192–93 n.34 (1961 Supp.)) (emphasis added). Thus, a determination on the issue of repudiation will often entail an examination of the repudiator's manifest intent to preserve a pre-existing contractual right to arbitrate as an alternative to contractual repudiation.

In this case, Local 70 answered the employers' complaint with the affirmative defense that it was not bound by the 1967–1970 collective bargaining agreement, the same agreement it now points to as expressing its right to insist upon arbitration. Local 70 did not assert a right to arbitration in a timely manner. Instead, it argued before the court that it preferred to have the action determined in a speedy trial. Local 70 also delayed over three years before moving the court to dismiss the lawsuit on the ground that the employers had failed to exhaust contractual grievance procedures and delayed an additional year until the day the trial was originally scheduled to commence before requesting a stay. Moreover, neither the motions for dismissal nor the motion for stay alleged that the provisions in the 1967–1970 agreement it now relies upon required arbitration.[8] On the contrary, it would be reasonable to infer from Local 70's motions that it desired trial to

the exclusion of an arbitral interpretation of the agreement.[9]

■ The record shows that Local 70 failed timely to inform the employers and the district court of its position that the agreement required that the dispute be arbitrated. Under these circumstances we must affirm the district court's finding of repudiation. To hold otherwise would condone an inordinate, prejudicial delay. During Local 70's delay of over four years in filing its motion for stay, it substantially invoked the litigation machinery by submitting several motions for summary judgment on the merits. Both the court and the employers were led to believe that Local 70 was content to take the matter to trial. Moreover, even if we could assume that Local 70's motion for stay pending arbitration was timely, its request did not raise the defense it now asserts on appeal. Local 70 did nothing to modify the original unequivocal repudiation it expressed in its answer.

Accordingly, we affirm the district court's conclusion that Local 70 repudiated its contract status and is estopped from relying on the arbitration provisions as a defense to the employers damages action arising out of the 1967–1970 agreement. *See Reid Burton,* 614 F.2d at 702–03 (collecting cases); *cf. Controlled Sanitation Corp.*

8. Local 70 argued that the *employers* actually considered their actions to be based upon violations of the 1970–1973 agreements and that therefore the court had to *dismiss* the action because those contracts required the submission of damage claims to arbitration and that if there was an issue as to which collective bargaining agreement was in effect during the strike, it was for the arbitrator to determine that issue. It also contended that if the 1967–1970 agreements did apply, the employers' damage claims were "factual" disputes which did not involve an interpretation of the master agreement and, therefore, had to be submitted to the local grievance procedures contained within the supplemental agreement. Moreover, Local 70 vigorously asserted that the court was required to *dismiss* the complaint because it was not tenable for a district court to stay proceedings. Finally, it contended that, in any event, work stoppages, sick-outs and picketing were not strikes and, therefore, any claims for damages resulting from such actions also had to be submitted to the grievance procedures.

9. Local 70's motion for stay was narrowly limited to a request for a stay pending submission of a single issue to the grievance procedure— which collective bargaining agreements were applicable to the dispute:

If the National Grievance Committee determines that the claims are governed by the 1970–1973 agreement through and including April 1, 1970, then this Court can proceed based upon a suit which alleges a breach of that collective bargaining agreement. *If the National Grievance Committee determines that it has no jurisdiction over claims except those occurring on or after May 18, 1970, then this Court can safely proceed with a suit based upon the 1967–1970 National Master Freight Agreement.* In the alternative, if the National Grievance Committee deadlocks over these issues then under either the 1967–1970 or the 1970–1973 agreement, this Court can safely proceed, with the intention of the parties contained in both agreements having been clearly effectuated (emphasis added).

*v. International Assoc. of Machinists & Aerospace Workers*, 524 F.2d 1324, 1326 n.3 (3rd Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976) (union not estopped when it pled inapplicability of collective bargaining agreement *but specifically reserved right to proceed with arbitration if contract did apply*). Because Local 70 is estopped from relying on the grievance procedures in the NMFA and the Supplemental Agreement, we need not review its contention that the arbitrator, rather than the district court, should have interpreted section 8(d).[10]

## III

Local 70 argues that the district court erred in holding the April and May work stoppages violative of the collective bargaining agreement. We have reviewed the district court's findings of fact and conclusion of law on these issues and conclude that we must affirm.

### A.

The court below found that Article 8 of the NMFA and Article 42 of the Supplemental Agreement required arbitration for all grievances or questions of interpretation arising under the contracts and all grievances or controversies affecting the mutual relations of the parties. Article 8 of the NMFA provides:

> *All grievances or questions of interpretation* arising under this Master Agreement or Supplemental Agreements thereto *shall be processed as set forth below.* (emphasis added).

Article 42 of the Supplemental Agreement states that "*any grievance or controversy affecting the mutual relations* of the employer and the union *shall* first be taken up between the local union and the individual employer involved" and if the matter is not resolved, it "*shall* be referred to the Joint Council 7 Labor Management Committee" (emphasis added).

Because Local 70 struck in April, the court found that Local 70 had violated the implied no-strike duty first recognized in *Teamsters, Chauffeurs, Warehousemen & Helpers v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Local 70 does not challenge the court's interpretation of the language in Articles 8 and 42 but rather mounts an attack on the district court's determination that a relevant implied no-strike obligation existed and that the only exception to Local 70's adherence to the obligation was the existence of a bona fide impasse.

Local 70 first contends that it struck over "terms and conditions of employment," thereby circumventing the scope of the admitted implied no-strike obligation. This claim is spurious. The court below concluded on the basis of ample evidence that the union was motivated by concerns which were clearly circumscribed by the no-strike provision.[11] Its conclusion is not clearly erroneous. Local 70 does not directly refute these findings. Moreover, it is doubtful that under the language of the agreements there was *any* room for stoppage in the absence of prior arbitration. As our quotation of the NMFA and Supplemental Agreement indicates, the uncontested lan-

---

**10.** In the usual case, the presumption of arbitrability would require the district court to defer to the arbitrator for an interpretation of the words "strike" and "in violation of this agreement". *See Howard Electric*, 423 F.2d at 165–66; *Los Angeles Paper Bag*, 345 F.2d at 759; *see generally Johnston-Tombigbee Furniture*, 596 F.2d at 128; *Carpenter's District Council v. Brady Corp.*, 513 F.2d 1, 3–4 (10th Cir. 1975); *Marble Products Co. of Georgia v. United Stone & Allied Products Workers*, 335 F.2d 468, 471–72 (5th Cir. 1964); *Stokely-Van Camp*, 480 F.Supp. at 49; *Commonwealth Oil Refining Co. v. Union Independiente de la Industria de Petroquimicas de Puerto Rico*, 443 F.Supp. 586,

588 (D. Puerto Rico 1977); *Charmers Industries, Inc. v. Liquor Salesmen's Union*, 415 F.Supp. 781, 785 (S.D.N.Y.1976). Because Local 70 is estopped from relying on the arbitration provision of the collective bargaining agreement, we do not reach this issue. For the same reason, we need not respond to the employers' contention that Local 70 failed to raise several of its current arguments in trial court.

**11.** The district court found that Local 70's strike motivation centered on a desire to break the employer away from its multi-employer bargaining unit.

guage of the relevant contract provisions is all-inclusive. *See Auto, Marine & Specialty Painters*, 577 F.2d at 610–11 ("all disputes and grievances" comprehends defense of laches); *cf. Rochdale Village*, 605 F.2d at 1296 ("any and all dispute hereunder" excludes disputes collateral to agreement).

▉ Local 70 next contends that the *Lucas Flour* implied no-strike principle is inapplicable because there is no express provision in the agreements denominating the grievance procedures as "final and binding arbitration." The lower court, however, correctly held that the presence of such an express appellation is irrelevant when the parties' intent indicates a desire fully to arbitrate. *General Drivers, W&H v. Riss and Co.*, 372 U.S. 517, 518–520, 83 S.Ct. 789, 790–791, 9 L.Ed.2d 918 (1963); *Santos v. District Council of New York City & Vicinity of United Brotherhood of Carpenters & Joiners*, 547 F.2d 197, 201 n.5 (2nd Cir. 1977); *Warren v. International Brotherhood of Teamsters*, 544 F.2d 334, 340 (8th Cir. 1976); *Braswell Motor Freight Line*, 422 F.2d at 112–113; *Truck Drivers & Helpers Local Union v. Georgia Highway Express, Inc.*, 328 F.2d 93, 94–96 (5th Cir. 1964).

▉ Local 70 also argues that even if the agreement contained an implied no-strike provision, it was excused from that obligation by an independent contractual provision, Article 37 of the NMFA. Under that provision "the respective parties shall be permitted all legal or economic recourse to support their requests for revisions if the parties *fail to agree* thereon." (emphasis added). The trial court equated the phrase

"fail to agree" with the term "impasse" and found that there was no impasse prior to the institution of the work stoppages. Local 70 does not dispute the absence of impasse; rather, it emphasizes the distinction between "fail to agree" and "impasse". Local 70 argues, contrary to the lower court's ruling, that "fail to agree" connotes a far lower standard of disagreement than "impasse". Under the "fail to agree" standard proposed by Local 70, minor preliminary disagreement could justify economic sanctions. We have been unable to uncover any court decisions supporting Local 70's viewpoint.[12]

On the other hand, *Motor Carriers Council, Inc. v. Local Union No. 600*, 486 F.2d 650, 652 (8th Cir. 1973), the principal authority relied on by the trial court, resolves the precise question at issue here in the context of a substantially identical collective bargaining agreement. The court in that case affirmed the lower court's contention that if "fail to agree" was not equivalent to "impasse," parties could always "fail to agree" upon the commencement of negotiations, thereby nullifying the arbitration provisions. *Id.* at 652–53; *cf. Newspaper Production Co. v. NLRB*, 503 F.2d 821, 825 (5th Cir. 1974) (casually noting a rough equivalence between "impasse" and "failure to agree"). Beyond the sound logic advanced by the Eighth Circuit in *Motor Carriers*, it should be apparent that the meaning claimed by Local 70 would be better captured by the word "disagree". "Fail to agree" suggests that an *attempt* is made to "agree",[13] whereas it could be argued that

12. Local 70 relies on *NLRB v. J. H. Bonck Co.*, 424 F.2d 634, 637–38 (5th Cir. 1970), as adequately depicting the "repeated" recognition of the distinction between "impasse" and "failure to agree". *Bonck*, however, merely held that the NLRB's factual determination of impasse was entitled to exceptional deference, *Bonck*, 424 F.2d at 638, and does not enhance Local 70's argument.

13. *See Clark v. Mt. Gilead Baptist Church*, 156 N.Y.S. 305 (Sup.1915) (where a building contract provided that, in case the owners and contractors failed to agree on matters of payment, the matter should be referred to a board of arbitration, mere failure to make payment on

demand is not a "failure to agree on matters of payment"); *In re Moore*, 79 Ind.App. 470, 475–476, 138 N.E. 783, 784 (1923) (workmen's compensation act providing that, if parties fail to agree regarding payment of compensation, or if, having made an agreement, they disagree as to continuance of payment, then either party may apply to an industrial board for a determination of the controversy, is in harmony with the rule that the law favors settlements, and implies that there shall be at least a good faith effort to settle the dispute and an actual disagreement as to the rights of the parties, before the industrial board is authorized to hear and decide the matter in dispute, the word "failure" connoting an attempt, an effort).

the word "disagree" would retain its full import without any attempt at mediation.[14]

## B.

Local 70 asserts that its mass observance of picket line activity conducted by Local 208 union members from Los Angeles was an insufficient predicate for the trial court's award of damages to the employers. Noting that the trial court had labeled the picket lines "unlawful," Local 70 argues that the trial court impermissibly focused on the nature of the picketing, rather than on the contractual relationship extant between Local 70 and the employers.

Local 70's argument either misconstrues or misrepresents the primary direction of the trial court's attention. Although the court gratuitously stated that "the mass honoring of the *illegal* picket line . . . was not protected by Article 9 of the Master Agreement . . . ," the legality of the picket line was not at the core of the trial court's determination. The damages award was based on clear evidence that, far from respecting stranger pickets, Local 70 *actively encouraged* and *aided* Los Angeles union members in their picketing. As the union suggests, "[i]f Local 70 had invited the pickets from Los Angeles, had made demands upon each one of the employees involved herein that they sign separate agreements, had taken an active role in ordering its men not to work, and had made an effort to ensure that other unionized members not

work, there might be some credence to the plaintiff's claim." The evidence offered at trial factually establishes such liability.[15] The trial court's findings of fact on this question are not clearly erroneous and the encouragement and support clearly present under these facts support the imposition of liability.[16] *See Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 216–18, 100 S.Ct. 410, 413–414, 62 L.Ed.2d 394 (1979) (law still requires proof of agency in order to impose liability for damages resulting from wildcat strikes; recovery denied absent instigation, support, ratification or encouragement of work stoppage); *United Steel Workers of America v. Lorain, A Div. of Koehring Co.*, 616 F.2d 919, 921–23 (6th Cir. 1980), *cert. denied*, 451 U.S. 983, 101 S.Ct. 2313, 68 L.Ed.2d 839 (1981) (same); *Southern Ohio Coal Co. v. United Mine Workers*, 551 F.2d 695, 701 (6th Cir. 1977), *cert. denied*, 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 155 (1978) (there may be circumstances where a union's studied ambivalence toward an unauthorized strike constitutes sufficient inducement, encouragement and condonation to allow damage recovery) (dictum); *Riverton Coal Co. v. United Mine Workers of America*, 453 F.2d 1035, 1042 (6th Cir.), *cert. denied*, 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972) (damages recoverable where union allowed wildcat strike to continue in order to bring pressure to bear on employer and reap benefits of illegal work stoppage without outwardly violating contractual commitments).[17]

---

**14.** Although the word "disagree" more closely approximates the meaning advanced by the union, our discussion of the term is offered for purposes of comparison only and should not be read as a suggestion that a different result necessarily would have been reached had the word "disagree" been present.

**15.** The district court also found that some of the May stoppage activity began *prior* to the arrival of the Los Angeles pickets.

**16.** The trial court's finding that certain picketing was secondary also supports the damages award because Article 9 of the NMFA expressly precluded such activity.

**17.** The trial court found that Local 70 was liable because it did not make a "good faith effort to return those employees to work once

it was determined that the picketing activity of Local 208 dissidents was an unlawful wildcat action not protected by . . . the agreement . . . ." This statement proves too much. Local 70 would be liable for failure to institute all reasonable means to abate stoppages *only where the agreement specifically provided such a responsibility or where it had actively encouraged the stoppage. Carbon Fuel Co.*, 444 U.S. at 216–18, 100 S.Ct. at 413–414. Nothing in the NMFA or Supplemental Agreement imposed a duty to exercise all reasonable means to abate the stoppage. *See Lorain*, 616 F.2d at 922 (phrase "actively discourage and endeavor to terminate" did not impose obligation to use all reasonable efforts to terminate stoppage where it did not specifically modify union liability clause). Consequently, the liability for the May stoppage can only be predicated upon the

## IV

The court below was required to determine not only the question of Local 70's liability, but also questions of damages attributable to Local 70's conduct. Several distinct damages issues are raised on appeal. For the most part, we affirm the lower court's awards. In computing damages attributable to loss of customers, however, it does not appear that the lower court determined whether any portion of the carriers' overhead should be excluded from the lost customers award. As a consequence, remand will be necessary.

### A.

Local 70 first claims that it was severely prejudiced because the employers' original complaint did not request recovery for damages caused outside Alameda County. The record, however, shows that the employers requested an amendment to conform to proof and that the amendment was submitted prior to the presentation of Local 70's case. The court took the motion under submission.

■ During the course of the trial, the issue of liability outside Alameda County was addressed by all parties. There is no merit in Local 70's contention that it was misled by the trial court. The court merely postponed its determination of the issue without definitively ruling either way. Moreover, the court seriously questioned the existence of any prejudice at an early stage in the litigation. Case law confirms the absence of prejudicial error in this context. *See Sauers v. Alaska Barge*, 600 F.2d 238, 244 (9th Cir. 1980); *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1211 (9th Cir. 1970); *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3rd Cir. 1969).

### B.

Local 70 also contends that it should not have sustained contractual liability as a consequence of the work stoppages occurring outside its jurisdiction because those stoppages did not involve any striking

trial court's finding of encouragement and sup-

members of Local 70 but only members of other bargaining units who respected picket lines established by Local 70 members.

Local 70's reliance on *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951 (3rd Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), in support of its contention, however, is unjustified. In *Eazor, wildcatting* union members picketed an employer and precipitated a sympathy strike by members of a fellow union. *Id.* at 965. Although the court intimated that a noncontractual remedy might have been available to the employer had it properly raised the issue at trial, the court found no union liability. Local 70's posture is far different from that of the union in *Eazor*. The union in this case initiated and retained control over the picket line activity.

■ Local 70 further argues that there is no contractual liability when workers outside of Local 70's bargaining unit either fail to work or take other economic action in response to its picket lines. The law does not support this position. *See Texas Distributors, Inc. v. United Association Journeymen & Apprentices*, 598 F.2d 393, 400–01 (5th Cir. 1979) (in employer's damage action under 29 U.S.C. § 158(b)(4) against alleged secondary picketing, it was irrelevant *which unions* actually refused to work while the union picket was present); *Campbell "66" Express, Inc. v. Rundel*, 597 F.2d 125, 128 (8th Cir. 1979) (evidence that trucks would not cross picket lines and that as a result employer suffered a loss of income presented a sufficient showing of possible irreparable harm to permit issuance of preliminary injunction against picketing); *Lawhon Construction Co. v. Carpet, Linoleum & Resilient Floor Decorators*, 513 F.2d 723, 724–25 (8th Cir. 1975) (damage recovered under 29 U.S.C. § 158(b)(4) when members of other trades refused to cross union picket lines and completion of project delayed); *Blue Diamond Coal v. United Mineworkers of America*, 436 F.2d 551, 558–59 (6th Cir. 1970), *cert. denied*, 402 U.S. 930, 91

port.

S.Ct. 1525, 28 L.Ed.2d 863 (1971) (damage flowing from work stoppage caused by union pickets is attributable to the parties responsible for the picketing).

In a similar vein Local 70 contends that because its personnel were not involved in production at the manufacturing plaintiffs, Sunshine Biscuit and Granny Goose, it cannot be liable for the work stoppages that resulted when production employees respected picket lines established by Local 70 members. Local 70 directs our attention to *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), for the proposition that there is a legal distinction between strikes by employees in one bargaining unit and strikes by employees in another unit in sympathy for the former.

Although such a distinction was drawn in *Buffalo Forge*, there is no merit in Local 70's reliance on the case: It simply held that a federal court could not enjoin a sympathy strike pending an arbitrator's decision on the question whether the strike was forbidden by a no-strike provision in the collective bargaining contract to which the striking union was a party. *Buffalo Forge*, 428 U.S. at 410–13, 96 S.Ct. at 3148–50. In this case, the conduct of the pickets, not the sympathy strikers, is at issue. As such, *Buffalo Forge* is no aid to Local 70. A union may be liable when its picket activity foreseeably induces the absence of employees, even though the employees are not members of the union. *See Texas Distributors*, 598 F.2d at 400–01; *Campbell "66" Express*, 597 F.2d at 128; *Lawhon Construction Co.*, 513 F.2d at 724–25; *Blue Diamond Coal*, 436 F.2d at 558–59.

## C.

Local 70 asserts that, as to both fixed cost and lost profits, the trial court failed to account for a reduction in the carrier's anticipated revenue caused by work stoppages that were contemporaneously affecting other carriers throughout the nation, especially in Los Angeles. Certain principles previously established in this circuit regarding damage awards are relevant in reviewing this contention. Once an employer has proven that it has suffered some injury, " '[it] need not detail the exact amount suffered; it will suffice if the evidence shows the extent of damages as a matter of just and reasonable inference, although the result may be only approximate.' " *Frito-Lay, Inc. v. Local Union No. 137, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers*, 623 F.2d 1354, 1364 (9th Cir. 1980), (quoting *Gulf Coast Building and Supply Co. v. Electrical Workers, Local 480*, 428 F.2d 121, 125–26 (5th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970)). As a corollary to this rule, a court will not "review on appeal the merits of various methods of calculation, so long as the method actually employed by the district court is designed to yield a reasonable approximation of damages." *Frito-Lay*, 623 F.2d at 1364–65.

Although Local 70 correctly maintains that the employers had the burden of segregating lost fixed costs and profits from the influence of work stoppages elsewhere, *see Motor Carriers Council v. Local Union No. 600*, 516 F.2d 316, 317–18 (8th Cir. 1975); *Abbott v. United Association of Journeymen & Apprentices*, 429 F.2d 786, 790 (5th Cir. 1970), there is no indication in either the record or the briefs that the trial court excluded such considerations. The effect of the Los Angeles work stoppage on the carriers' fixed costs was expressly determined and sequestered from the fixed cost claimed by the employers. By deducting the fixed cost factors attributable to the Los Angeles carriers, the trial court apparently followed the dictates of *Motor Carriers Council*. Reliance on this formula was not error.

Local 70's contention that the trial court did not consider the effect of other work stoppages on lost profits is unfounded. The trial court calculated lost profit damages on a 50 percent basis of the inbound and outbound revenue allocated to the Oakland facilities, as applied to the operating ratio of the specific carriers, and on the revenue which other terminals would have

received but for the work stoppage at the Bay Area facilities. Although the 50 percent formula would not seem to be an absolute reflection of the actual effect of other work stoppages on the Bay Area lost profits, other courts have used a fifty percent formula for similar purposes.[18] Indeed, such a formula is wholly appropriate when a damage calculation, such as that before the lower court, is not susceptible to precise formulation. *See Kissell Co. v. Gressley*, 591 F.2d 47, 50 (9th Cir. 1979) (in applying Arizona law, court notes that once fact of lost future profits is established, courts will not quibble over numbers involved, but will adopt a lenient approach to measurement of injury). In any event, Local 70 presents this court with no alternative method of computing either fixed cost or lost profit in light of work stoppage elsewhere or any evidence that the trial court's method was unreasonable. Such a failure has influenced at least one court's denial of appellate relief under similar circumstances. *See Motor Carriers*, 516 F.2d 316, 316–17 (8th Cir. 1975). Under the circumstances, we cannot find fault with the district court's formula.

### D.

■ On the basis of testimony it extracts from the trial record, Local 70 argues that the carriers were able to recoup substantial revenue lost during the strike through various embargo and deferral mechanisms. In support of this position Local 70 cites *Foam and Plastics Division, Tenneco Chemicals, Inc. v. General Drivers & Helpers Local 401*, 520 F.2d 945 (3rd Cir. 1975), to the effect that only revenues which have been permanently lost can be recovered in damages.

Although Local 70 correctly states the law, *Tenneco* involved a carrier's claim for lost revenue allegedly sustained during a work stoppage with a duration of only one work shift. The court denied the carrier's claim, finding that the carrier failed to

meet its burden of proving "that production was lost in view of the substitution of other carriers and the brevity of the work stoppages . . . ." *Tenneco*, 520 F.2d at 951. These same factors undoubtedly contributed to Tenneco's inability to establish that its pick-up revenues were irretrievably lost. Because the stoppages at issue in this case were more extended (eight and ten days respectively), *Tenneco* is of no utility for purposes of factual comparison.

The employers argue that pre-strike and post-strike monthly averages presented at trial indicate that there had been no recoupment of revenue. Averaging prior monthly revenue as indicia of lost revenue has been countenanced by this court and others, *Maxey v. Butcher's Union Local No. 126*, 627 F.2d 912, 916 (9th Cir. 1980); *Frito-Lay*, 623 F.2d at 1363–65; *Anderson v. International Brotherhood of Electrical Workers*, 422 F.Supp. 1379, 1385 (W.D.Pa.1976); *Union Tank Car Co. v. General Truck Drivers*, 309 F.Supp. 1162, 1173–74 (E.D.La.1970), and the paradigm offered by the employers would have satisfied at least one former union defendant. *United Electrical Radio & Machine Workers v. Oliver Corp.*, 205 F.2d 376, 387–89 (8th Cir. 1953) (in jury trial resolving defendant union's liability in damages for work stoppages, defendant's claim of revenue recoupment insufficient to require production of employers previous and subsequent months average revenue). We therefore affirm the district court on this issue.

### E.

■ Local 70 complains that the trial court failed to account for the absence of actual wear and tear on the carrier's vehicles in its award of depreciation. The point has been settled in this court's decision in *Frito-Lay, Inc. v. Local Union No. 137, International Brotherhood of Teamsters*, 623 F.2d 1354 (9th Cir. 1980), and any argument

---

**18.** *Cf. Nolan Brothers, Inc. v. United States*, 437 F.2d 1371, 1386–87 (Ct.Cl.1971) (standby expense occasioned by breach of contract determined at one-half rental value of equipment); *Laburnum Construction Corp. v. United States*, 325 F.2d 451, 459 (Ct.Cl.1963) (one-half rental value recoverable where equipment idled due to defendant's breach).

on the matter has been foreclosed.[19] In *Frito-Lay*, we affirmed the district court's award of straight-line depreciation for vehicles idled by illegal union work stoppage. *Frito-Lay*, 623 F.2d at 1364–65. Consequently, we reject Local 70's contention that the trial court was required to allocate depreciation between a use and time basis.

### F.

The district court found that three carriers, Crescent, Delta and Sterling Transit, permanently lost customers as a result of the work stoppage. Local 70 contends that by refusing to deduct overhead (fixed costs) from projected lost gross profits, the trial court erred.

There is merit in the Local 70's assertion. In determining this element of damage, the trial court, without any qualification, outlined a previous trial court's award of overhead and its subsequent affirmation by this court in an unpublished opinion. As a result, it is unclear whether the court applied the correct standard.

In this circuit, "[d]amages may be awarded on the basis of gross profits [profits minus variable expense] when the breach does not significantly reduce overhead." *Edwin K. Williams & Co. v. Edwin K. Williams*, 542 F.2d 1053, 1062 (9th Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (citing *Buono Sales, Inc. v. Chrysler Motors Corp.*, 449 F.2d 715, 719–20 (3rd Cir. 1971)). *Buono Sales* is one of the leading cases supporting the proposition that when a promisee, by virtue of a promisor's breach, is freed to apply fixed

costs in another profitable manner, the advantage so derived must be deducted from the gross profit along with variable costs.

The court in *Edwin K. Williams* allowed recovery of overhead, absent a demonstration that the "breach [did] not significantly reduce overhead," *Edwin K. Williams*, 542 F.2d at 1062. In *Buono Sales* and *Vitex Manufacturing Corp. v. Caribtex Corp.*, 377 F.2d 795, 799–801 (3rd Cir. 1967), the Third Circuit held that fixed costs are recoverable only if truely lost. *Buono* and *Vitex Manufacturing* would require deduction of fixed cost from gross profit in any situation in which such overhead could be defrayed, not merely when it could be reduced. *Buono Sales*, 449 F.2d at 719–721; *Vitex Manufacturing*, 377 F.2d at 799–801. In *Buono*, remand was necessitated on this issue because the trial court failed to consider whether fixed costs had been profitably applied to a new line of sales, thereby minimizing the effect of defendants' breach. *Buono Sales*, 449 F.2d at 721. Other situations could be imagined in which minimization would not be possible. *See Huffman Towing, Inc. v. Mainstream Shipyard & Supply, Inc.*, 388 F.Supp. 1362, 1371–72 (N.D.Miss.1975) (lost fixed cost fully recoverable where return of two boats delayed).

 It does not appear that the district court adhered to the principles announced in *Edwin K. Williams, Buono Sales* or *Vitex Manufacturing*. Remand will be required because it is unclear whether the court below considered the extent to which the carriers applied their freed fixed costs, if any, to other profitable ventures.[20]

---

19. *See Sears Oil Co. v. Commissioner*, 359 F.2d 191, 198 (2nd Cir. 1966) (for depreciation purposes useful life of barge initiated when it became ready for service, not when put into use); *P. Dougherty Co. v. Commissioner*, 159 F.2d 269, 272–74 (4th Cir. 1946), *cert. denied*, 331 U.S. 838, 67 S.Ct. 1515, 91 L.Ed. 1850 (1947) (same); *Kittredge v. Commissioner*, 88 F.2d 632, 634 (2nd Cir. 1936) (idle factory may depreciate more rapidly than one in use). *But see Airco-Speer Carbon-Graphite v. International Union of Electrical*, 479 F.Supp. 246, 257–58 (W.D.Pa.1979) (denying employer's demand for depreciation while noting that employer had failed to distinguish idled and used time and

indicating that it was doubtful such damages could have been within the contemplation of the parties).

20. Local 70 raises two other issues. First, it argues that, by turning down an offer of 50 percent of Sunshine Biscuit's business, Crescent Lines failed to minimize its damages. The trial court made findings on this matter and the record supports its conclusion that it was economically difficult for Crescent to handle the Sunshine Biscuit account on such a greatly reduced scale. We find no error in the district court's conclusion that Local 70 did not establish the manufacturing plaintiffs' failure to mitigate damages. *See, e. g., Eazor Express*, 520

## V.

In summary, because the union's repudiation occurred in proceedings before the district court, we affirm the court's conclusion that it had jurisdiction to determine the existence of contractual repudiation. We also affirm the court's findings of repudiation and agree with its determination that the Local 70's April and May work stoppages and picketing violated the NMFA and Supplemental Agreement. Finally, although in large part we affirm the court's damage awards, the question whether the carriers defrayed portions of their overhead and deducted that amount from lost gross profit must be remanded. It does not appear that the court below determined whether the carriers applied any overhead

F.2d at 971–79; *Roadway Express, Inc. v. Highway Truck Drivers & Helpers,* 299 F.Supp. 1058, 1062–63 (E.D.Pa.1969); *Airco Speer Carbon-Graphite,* 479 F.Supp. at 258 (W.D.Pa. 1979). *Delaware Coca-Cola Bottling Co. v. General Teamsters Local Union 326,* 474 F.Supp. 777, 787 (D.Del.1979), *rev'd on other grounds,* 624 F.2d 1182 (3rd Cir. 1980).

Second, Local 70 argues that the temporary loss of California Motor Express' [CME] Pepsi Cola account was proven by mere hearsay. CME's representative testified to the following:

It was Les Vierra that told me that New York Traffic Department had told them to favor the truck lines that were servicing them during this period of strike activity.

We need not resolve this hearsay question because CME's representative also testified that he had been informed by a Pepsi Cola representative that he had no orders for CME. The out-of-court statement of the Pepsi-Cola representative was not offered for the truth of the matter asserted; rather, *the statement had an operative effect in the nature of a contract rejection wholly apart from the truth of the assertion. See Gibbs v. State Farm Mutual Insurance Co.,* 544 F.2d 423, 428 (9th Cir. 1976) (in action against insurer to recover on theory of bad-faith failure to settle, letter from insured to insurer's attorney informing him that father of child injured in accident would be happy with settlement within policy limits was properly admitted to show that insurer had received this information and did not constitute hearsay because not admitted for its truth); *Great Lakes Gas Transmission Co. v. Grayco Constructors, Inc.,* 506 F.2d 498, 503–04 (6th Cir. 1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1330, 43 L.Ed.2d 426 (1975) (in action by gas transmission company to recover damages from contractor which constructed portion of pipeline which ruptured, letter from Director of Transportation directing plaintiffs to reduce operating pressure because of ruptures properly admitted *not* as proof of ruptures but to substantiate plaintiff's claim of loss of revenues stemming from pressure reduction); Wigmore, *Evidence* § 1770 at 190 (3d ed. 1940) ("[t]he fact of *sending a notice* is often essential as a part of the issue, for example, a notice to an indorser, a notice of recission, a notice of rejection of defective goods, a notice of injury by municipal negligence ... in such cases the terms of the notice are receivable under the present principle, without regard to the truth of any assertion that may be contained in it"); *see generally,* Fed.R.Evid. 801(c) (1976). Alternatively, introduction of the Pepsi-Cola representative's statement could be sustained on a verbal act rationale. *See NLRB v. H. Koch & Sons,* 578 F.2d 1287, 1290–91 (9th Cir. 1978) (whether agreement to pay severance pay was entered into by parties; testimony as to what witness said was evidence of verbal conduct pursuant to rule 801(c)); *cf. Avery v. Commissioner,* 574 F.2d 467, 468 (9th Cir. 1978) (admission of hearsay testimony of IRS agent, who in making original deficiency determination relied heavily on information from deceased, to support reasonableness of agents actions was consistent with testimony's limited admission on motion to shift burden of proof and such testimony was not used as substantive support for Commissioner of Internal Revenue's action in estimating that taxpayer had sold a total of $60,000 worth of heroin in a three-month period).

The trial court also received testimony establishing that CME's thirteen year account with Pepsi-Cola was interrupted precisely when the April work stoppages commenced. Evidence also established that the account was not revived until late June. The trial judge therefore could permissably infer from the cessation of the account and the CTE representative's testimony concerning the Pepsi-Cola's representative's operative rejection that the damage was attributable to Local 70. It was not necessary for the lower court to rely upon the Pepsi-Cola representative's contention that his company was "taken care of" or the Pepsi-Cola representative's out-of-court narration of what the New York Traffic Department told him.

Moreover, our review of the record indicates that Local 70 did not register an objection to the CTE representative's testimony at trial. On the contrary, the record indicates that counsel for Local 70 elicited from the CTE representative the same testimony it now characterizes as hearsay. Local 70 cannot now be heard to complain of the testimony's introduction. *See Vannoy v. Chicago, Burlington & Quincy Railroad Co.,* 462 F.2d 186, 187 n.2 (9th Cir. 1972); *Hayden v. Chalfant Press, Inc.,* 281 F.2d 543, 548 (9th Cir. 1960).

to other profitable ventures, thereby reducing their damages.

AFFIRMED in part; REMANDED in part.